UNITED STATES of America,
Plaintiff-Appellee,

v.

Terry BOTTOM, Dave Davis and Elam
Bracy Hamilton,
Defendants-Appellants.

No. 80–7314.

United States Court of Appeals,
Fifth Circuit.
Unit B

March 2, 1981.

L. Drew Redden, Birmingham, Ala., James Alexander, Athens, Ala., for defendants-appellants.

J. R. Brooks, U. S. Atty., Herbert H. Henry, III, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before SIMPSON, RONEY and THOMAS A. CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

A jury found defendants, Bottom and Hamilton, guilty under two counts of mail fraud pursuant to 18 U.S.C. § 1341 and found defendant Davis guilty under one count. The trial judge instructed "not guilty" verdicts as to the remaining counts of the fourteen count indictment. From the ensuing judgment and sentences, the defendants appeal their convictions to this court. We affirm.

The appellants, county commissioners of Limestone County, Alabama, were responsible for the maintenance of county roads in their districts, separate geographical areas of the county. Each carried out the full-time job of county commissioner from a tool shed which served as an office, storage room and garage. The scheme in which these commissioners participated involved a jobber, Baldwin, doing business as the Lisco Co., who sold corrugated metal pipe which he bought from his sole supplier, Tri-State Drainage Products Company (Tri-State). Baldwin would take orders from Limestone County and then call them in to Tri-State which would ship the pipe to the commissioner at his tool shed office. Upon delivery of the pipe, the Tri-State truck driver would leave a copy of the delivery ticket, which stated the quantity and provided a description of the pipe delivered, with the commissioner and return the other copies of the signed delivery ticket to Tri-State where several copies were filed and one was sent to Baldwin at the Lisco Company as a bill accompanying an invoice. Upon receiving the Tri-State invoice with copies of the signed delivery tickets, Baldwin would send a Lisco invoice to Limestone County. He would not send copies of the Tri-State de-livery tickets with his invoice, but would instead prepare Lisco "dray tickets", which matched in quantity and description the items reflected on the Lisco invoice. Thus, the only Tri-State delivery tickets Limestone County ever received were the copies which were left with the commissioner actually receiving and signing for the delivery at his tool shed office.

There were two types of illegal invoices charged in this scheme, "padded" invoices and "bogus" invoices. Padded invoices were made out for more pipe than was delivered. The commissioner received half of the amount of the pad in cash. Bogus invoices were invoices as to which nothing was delivered but an amount was billed; the commissioner received half of the amount billed in cash.

Limestone County usually paid its vendors such as Baldwin by the tenth of the month. The invoices were submitted to the commissioners for formal approval at their regular meeting occurring on the third Monday of the month. The commissioners would each initial a copy of the check paying an invoice. The check copy was stapled to the invoice with any other supporting documents. Because of the county's practice of paying vendors by the tenth of each month, the commissioners' initialing of the check copies occurred after the check had been issued and mailed to the vendor. The checks reflecting amounts for padded or bogus invoices were mailed to Baldwin in this manner.

The defendants went to trial before a jury on their pleas of not guilty on February 11, 1980. Their trial continued through February 20, 1980 when, because the jury failed to reach a unanimous decision, a mistrial was ordered by the court. The second jury trial began on March 10, 1980. The defendants moved for judgment of acquittal at the close of the government's case, at the conclusion of all the evidence and after the jury's verdict was received. After deliberating for eight hours, 9:00 A.M. to 5:00 P.M., on March 19, the foreman of the jury on March 20 at approximately 9:45 A.M. sent a message to the judge stating that the

jury was deadlocked and could not resolve the matter. The trial court then, on its own volition, gave an "Allen" charge to the jury. After the charge, the jury began deliberations again at 9:56 A.M.; and at 1:40 P.M., the jury returned its verdict finding Hamilton and Bottom guilty under counts seven and eleven and Davis guilty under count seven. The court then stated that consistent with the jury's verdict he was going to instruct that a verdict of not guilty be entered on all counts but seven and eleven. The defendants' motions for judgments of acquittal and for new trial were denied on April 15, 1980.

The following issues are before us on appeal:

1. Did the trial court err in overruling defendants' motion for judgment of acquittal because the variance of the government's proof of the scheme from the scheme charged in the indictment was so great as to render the proof insufficient to support the verdict?

2. Did the trial court err in overruling defendants' motion for judgment of acquittal because the jury verdicts were inconsistent?

3. Did the trial court err in overruling defendants' motion for judgment of acquittal because the scheme reached fruition prior to the claimed operative mailings so as to render the evidence insufficient to prove a material element of the alleged offense?

4. Under the totality of the circumstances, including the prior mistrial because of a deadlocked jury, was the trial court's giving of the "Allen" charge reversible error?

■ In considering the first issue, as to whether there is sufficient evidence to support the verdict in light of the variance between the government's proof of the scheme at trial and the scheme as charged in the indictment, we note that our standard of review on a motion for judgment of acquittal is whether viewing the evidence most favorably to the Government, a reasonable-minded jury could find the admissible evidence sufficient to support the jury's verdict of guilty. All reasonable inferences and credibility choices must be made in favor of the jury verdict. *United States v. Maner*, 611 F.2d 107, 108–09 (5th Cir. 1980). *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Baker*, 633 F.2d 696 (5th Cir. 1980). It is also the law that in considering a variance between the indictment and the proof, the true inquiry is not whether there has been a variance in proof, but whether there has been such a variance as to "affect the substantial rights" of the accused. *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

■ Each count of the indictment charged the defendants with participating with Baldwin in the devising of a scheme to defraud Limestone County, Alabama. This scheme is alleged to consist of the defendants' placing of orders for metal culvert with Baldwin which resulted in his preparing false invoices on which the quantity of culvert shipped to Limestone County was increased to a quantity greater than was actually delivered. The defendants are also charged in each count with approving the invoices which they knew were false and of dividing with Baldwin the net amount paid by Limestone County for pipe ordered on the invoice but not delivered. In addition, every count of the indictment charges the defendants with agreeing with Baldwin to prepare and submit for their approval for payment totally false invoices, that is invoices which reflected a quantity of pipe ordered when in fact no pipe was delivered, and of dividing equally with Baldwin the amount paid on the false invoices.

Counts seven and eleven, with which we are concerned here, reallege the first paragraph of count one, paraphrased in the immediately preceding paragraph, and then charge that in December 1977 and May 1978 checks, numbers 1913 and 2366, were drawn on the account of Limestone County, Alabama, for $5,520.50 and $6,361.56 respectively and were mailed to Baldwin in violation of 18 U.S.C. § 1341. These two checks were for amounts paid on totally false or bogus invoices. Simply stated, the indict-

ment charges the defendants with agreeing with Baldwin to a scheme to make false, either padded or bogus, invoices from which Baldwin received money from Limestone County which he then divided equally with the commissioners.

The record, however, shows a different chronology than the indictment charges. The record reflects that Baldwin met with the defendants in December 1977 and May 1978 and that they agreed that each commissioner would tell Baldwin the amount of pipe to be billed or invoiced [1] but not to be delivered. After the amounts and description of the pipe had been agreed on, Baldwin computed the value of the pipe to be billed and paid the respective commissioner fifty percent of the billing price up-front before any other step in the scheme occurred.[2] After the money was paid to the commissioners, the check was issued and mailed and then the invoice was submitted to the commissioner for approval by initialing.[3]

Based on the evidence pertaining solely to the totally bogus invoices, there is no material variance from the scheme charged in the indictment and proved at trial. The chronology as proved was not exactly the same as is set out in the indictment, but the indictment and the proof "substantially" correspond and any variance was not of such character as to mislead the defendants at trial or to deprive the defendants of their right to be protected against another prosecution for the same offense. The proof was sufficient to support the verdict at trial.

■■■ The second issue questions the consistency of the verdicts. Rigid consistency of the verdict is not necessary in a multicount indictment as long as the convic-

tion is adequately supported. *See United States v. Lichenstein*, 610 F.2d 1272, 1279 (5th Cir. 1980), ·cert. denied, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). In his order entered April 15, 1980, the trial judge explained that there was no substantial inconsistency in the verdicts and we agree. He stated:

The court cannot avoid noting, however, that defendants misunderstand the nature of the jury verdicts. The jury did not find the defendants not guilty of any charge. Only verdicts of guilty were returned. Upon receipt of those verdicts, rather than require the jury to return to the jury room for further deliberation on the remaining charges and rather than declaring a mistrial, the court on its own motion entered judgments of not guilty with regard to the charges which were not the subject matter of the three verdicts of guilty. Thus there is nothing inconsistent in the jury verdicts, any inconsistency being between the jury verdicts of guilty and the court's disposition of the remaining charges. The ability of the jurors to reach the verdicts which they reached is consistent with the evidence. Out of all of the more than 40 "bogus" invoices for pipe involved in this case there were only 5 invoices with regard to which no pipe at all was shipped. These 5 invoices all took place in either December of 1977 or May of 1978 and were the subject of Counts 7 and 11. The absence of a jury verdict of guilty with regard to the defendant Davis under Count 11 is consistent with the fact that he alone of the 3 defendants did not submit a "bogus" invoice for the month of May 1978. Throughout the entire indictment there was no charge against any

---

1. The Government's Exhibit 7–B contains the bogus invoice for pipe with the check copy being the top page and bearing the Appellants' initials. Record at 196–97. The Government's Exhibit 7–A is the Limestone County check mailed to the Lisco Company in payment of the bogus invoice for pipe in the Government's Exhibit 7–B. Record at 192. Both of these exhibits reflect the $5,520.50 amount charged in count 7 of the indictment and are evidence of the December fraud.

The testimony concerning the May fraud is found in the record at 191, at 756–58, at 1212 and at 1388. The false invoice for May is the Government's Exhibit 11-B and the May check is the Government's Exhibit 11-A. Both items reflect the $6,361.56 amount charged in the indictment.

2. Record at 733–36.

3. Record at 1211, 1326, 1389.

defendant similar in nature or degree of culpability to the charges with regard to which the jury found the defendants guilty other than these particular charges.

■ Concerning the next issue as to the sufficiency of the evidence to prove mail fraud, the defendants argue that the scheme was complete once they received their money from Baldwin, which occurred up-front before Baldwin submitted his invoices to the county, before the county submitted checks to Baldwin, and before the commissioners initialed copies of the checks; and that if the scheme was complete, then the mailings were not sufficient to bring the transactions within the scope of the mail fraud statute. The defendants rely on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).

In *Maze,* the defendant was held not to have violated the mail fraud statute when he fraudulently used a credit card to obtain goods and services for which the invoices were mailed to victim banks because the mailings were not sufficiently closely related to defendant's scheme to bring his conduct within the statute. The scheme was held to have reached fruition when he received the goods and services no matter where the invoices were mailed or even if they were mailed at all. *United States v. Maze, supra,* 414 U.S. at 402, 94 S.Ct. at 649.

Since *Maze* a number of recent Fifth Circuit decisions have relied on it and further interpreted the law in this circuit. See *United States v. Rodgers,* 624 F.2d 1303 (5th Cir. 1980); *United States v. Freeman,* 619 F.2d 1112 (5th Cir. 1980); *United States v. Kent,* 608 F.2d 542 (5th Cir. 1979); *United States v. Knight,* 607 F.2d 1172 (5th Cir. 1979). The *Kent* case cited immediately above is helpful in the instant case. Concerning the requisite statutory purpose of using the mails for executing the scheme the *Kent* opinion states in pertinent part:

The requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon the information and documents passed through the mails, . . . , and if the use of the mails was "an integral part of the scheme to defraud," . . . . This test of dependence does not demand that the use of the mails rather than of a private messenger or other means was itself essential to the fraudulent scheme or that "the success of the scheme actually depended on the mailings in a 'but for' sense." . . . It instead requires that the thing mailed was an integral part of execution of the scheme so that the use of the mails was in this way "incident to an essential part of the scheme."

The dependence test is not met if use of the mails is made after the scheme has been fully consummated, *but a fraudulent scheme may depend on a mailing even after the defrauders have received the sought-after money or documents, because "the use of the mails after the money is obtained [or documents stolen] may be for the purpose of executing the fraud . . . .* This is another way of saying that the scheme may embrace more than just fraudulent acquisition or money or documents.

*United States v. Kent, supra,* 608 F.2d at 546 (emphasis added).

The fraudulent scheme in the instant case employed mailings which were integral to the execution of the fraudulent plans and which were not made after the fruition of the fraud but were necessary to complete the scheme. The scheme was not complete when Baldwin paid the defendants "up-front" the bogus or padded amounts in the invoices because Baldwin still needed the assistance of the defendants, who were the only ones who knew about the fraud and who had control of all the paperwork in their districts, to initial copies of the checks which reflected payment of the phony invoice attached to it. Furthermore, the county was not defrauded and the scheme complete until the checks were approved by the commissioners, the money released and the checks mailed to Baldwin. From the beginning of the scheme, the defendant commissioners, who knew that the invoices were bogus or padded, were also aware that Baldwin would be paid by a check mailed to

him by the county. Therefore, in this case, the mailing of the checks was an essential step integral to the completion or fruition of the scheme.

■ The fourth and final issue questions the validity of the modified "*Allen*"[4]

4. "Allen" refers to the case *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The term is used generally in reference to supplemental instructions urging a jury to forego their differences and come to a unanimous decision.

5. The charge given by the trial judge reads as follows:
Since you are here deliberating, I'm going to ask that you continue your deliberations for some time longer in an effort to agree upon a verdict, and to dispose of this case, if you can.

And in that connection, there are a few additional comments I would like to make at this time for your consideration.

First of all, I think as you are keenly aware, this is an important case. The trial obviously has been expensive in time, in effort, and in money, both for the defense and also for the prosecution.

If you should fail to agree on a verdict, the case is left open and may need to be retried again.

Obviously another trial would only serve to increase the cost for both sides. And there is no reason to believe that the case could be tried again by either side better or more exhaustively than it has been tried before you during the past two weeks.

Any future jury must be selected in the same manner and from the same source of jurors as you were chosen. And there is no reason to believe that the case could ever be submitted to twelve men and women more conscientious, more impartial, or more competent to decide the case or that more or clearer evidence could be produced at any other trial.

If a substantial number of you are for conviction, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one. Since it appears to make no effect or impression upon the minds of the other jurors.

On the other hand, if a majority or even a lesser number of you are for acquittal, the other jurors ought seriously to ask themselves again and most thoughtfully whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors. And whether they should distrust the weight and sufficiency of the evidence which fails to convince several of their fellow jurors beyond a reasonable doubt.

charge given in this case.[5] The appellants objected to the giving of the "*Allen*" charge under the totality of the circumstances including the prior mistrial because of a deadlocked jury and cited *United States v. Fossler*, 597 F.2d 478 (5th Cir. 1979). We do not find *Fossler*,[6] a case in

Remember at all times that no juror is expected (to surrender) a conscientious conviction he or she may have as to the weight or the effect of the evidence. But remember, also, that after full deliberations and consideration of the evidence in this case, it is your duty to agree upon a verdict, if you can do so without surrendering your own conscientious convictions.

You must also remember that if the evidence in the case fails to establish guilt beyond a reasonable doubt, the defendants should have your unanimous verdict of not guilty.

You may now be as leisurely in your deliberations as the occasion may arise. And should also take all the time which you feel is appropriate or necessary for a thorough consideration of this case.

I do think it is important that because of the duration of this trial, I ask you once again to return to the jury room and continue your deliberations with these few additional comments that I have made to you in mind obviously to be considered by you in conjunction with all of the other instructions as to the law which I have given to you earlier in the case.

I'm going to ask you once again if you would at this time return to the jury room and resume your deliberations.

Thank you.

6. The following are the facts pertinent to the "*Allen*" charge in *Fossler*:
The jury retired at about 12:00 noon on Friday. At 5:10 P.M., the jury foreman sent a note to the trial judge telling him that the jury could not reach a unanimous decision. The judge then gave an *Allen* charge orally with no objection by Fossler. At 9:55 P.M., the jury foreman again sent word to the judge, telling him that the jury could not reach a verdict. The trial judge, without objection by either party, then sent the jury home for the weekend. On Monday, at 9:30 A.M., court reconvened and the trial judge gave the jury the full written charge minus the *Allen* charge. At 2:25 P.M., the jury foreman for a third time sent word to the judge that the jury could not agree to a verdict. The judge then, over the objection of Fossler, sent the jury a written copy of the *Allen* charge he had previously given orally. A verdict of guilty was returned about an hour later.

which we found the district court abused its discretion in delivering the *"Allen"* charge on two separate occasions in a single trial and reversed the conviction, to be on point. We find no case exactly on point in this circuit or in any other. *See generally United States v. Sielaff*, 552 F.2d 588 (7 Cir. 1977). That case involved a former mistrial and an *"Allen"* charge but was decided on other grounds. We reach our decision here without the benefit of guiding precedent.

Here two separate trials were held; the first trial ended in mistrial and the second trial ended in guilty verdicts after an *"Allen"* charge was given to a deadlocked jury. Much stress is laid in argument upon the fact that this was a second trial. In fact the only reference in the record to the prior mistrial was during voir dire, when three jurors indicated at the bench, in private one on one conversations with the trial judge that they had heard of the former mistrial but nevertheless could render an impartial verdict. We do not consider this single circumstance of sufficient import to render the guilty verdicts suspect because of coercion.

The law in this circuit concerning the *"Allen"* charge is set forth in *United States v. Bailey*, 468 F.2d 652 (5th Cir. 1972), aff'd en banc, 480 F.2d 518 (5th Cir. 1973). *Bailey* gives two requirements for a proper *"Allen"* charge: (1) the semantic deviation from approved *"Allen"* charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved *"Allen"* charge must not be coercive. *United States v. Bailey, supra*, 468 F.2d at 664. The charge in the instant case meets the first criteria because the language in the charge is similar to that already approved by this court and approved by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit.[7] *See United States v. Baker, supra*, at 698; Committee on Pattern Jury Instructions District Judges Association 1978, *Pattern Jury Instructions (Criminal Cases)*, 168–69 (1979).

---

*United States v. Fossler*, 597 F.2d 478, 483 (5th Cir. 1979).

7. The charge prepared by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit 1978 reads as follows:

I am going to ask that you continue your deliberations in an effort to agree upon a verdict and dispose of this case; and I have a few additional comments I would like for you to consider as you do so.

This is an important case. The trial has been expensive in time, effort and money to both the defense and the prosecution. If you should fail to agree on a verdict the case is left open and must be tried again. Obviously another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.

Any future jury must be selected in the same manner and from the same source as you were chosen, and there is no reason to believe that the case could ever be submitted to 12 men and women more conscientious, more impartial, or more competent to decide it, or that more or clearer evidence could be produced.

If a substantial majority of your number are for a conviction, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one since it appears to make no effective impression upon the minds of the others. On the other hand, if a majority or even a lesser number of you are for acquittal, the other jurors ought seriously to ask themselves again, and most thoughtfully, whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors, and whether they should distrust the weight and sufficiency of evidence which fails to convince several of their fellow jurors beyond a reasonable doubt.

Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence. But remember also that, after full deliberation and consideration of the evidence in the case, it is your duty to agree upon a verdict if you can do so without surrendering your conscientious conviction. You must also remember that if the evidence in the case fails to establish guilt beyond a reasonable doubt the accused should have your unanimous verdict of Not Guilty.

You may be as leisurely in your deliberations as the occasion may require and should take all the time which you may feel is necessary.

I will ask now that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given to you.

We also find the second criteria met in this case; the circumstances surrounding the giving of the *"Allen"* charge were not coercive. The former mistrial was not mentioned in the second trial so far as we can tell from the record; therefore, we may treat the two trials as separate and look only at the second trial for coercive circumstances. In the second trial, no deadline was set for the jury's decision. The jury deliberated another three hours after the *"Allen"* charge was given from 9:56 A.M. to 1:40 P.M., not an unduly short amount of time. The time of the day was not late. The day was not Friday or the day before a holiday. The weather was not alleged to be inclement. In sum, we find no error in the instructions to the jury under the circumstances in this case.

AFFIRMED.