UNITED STATES of America, Plaintiff-Appellee,

v.

**Walter Merle HEFFINGTON, Russell Preston White, Jr. and Anthony Frank Giella, Defendants-Appellants.**

No. 81–1296.

United States Court of Appeals, Fifth Circuit.

Aug. 2, 1982.

Rehearings Denied Aug. 30, 1982.

Jack Banner, Wichita Falls, Tex., for Heffington.

Lawrence B. Mitchell, Dallas, Tex., for White.

Burleson, Pate & Gibson, Michael P. Gibson, Dallas, Tex., for Giella.

Richard H. Stephens, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GARZA, POLITZ and WILLIAMS, Circuit Judges.

GARZA, Circuit Judge:

Defendants-Appellants, Walter Merle Heffington, Anthony Frank Giella and Russell Preston White, Jr., appeal from convictions arising from a thirteen-count indictment filed in March, 1981. The indictment charged appellants with conspiracy to defraud in violation of 18 U.S.C. § 371 (Count 1), inducing investors to travel in interstate commerce in the execution of a scheme to defraud in violation of 18 U.S.C. § 2314 (Counts 2 through 4), causing the interstate transportation of checks knowing such

checks to have been taken by fraud in violation of 18 U.S.C. § 2314 (Counts 5 and 6), and causing the interstate wire transfer of funds pursuant to the fraudulent scheme in violation of 18 U.S.C. § 1343 (Counts 7 through 13). Appellants were tried jointly in May, 1981. Heffington and Giella were convicted on all thirteen counts; White was convicted on the conspiracy count only. Appellant Heffington was fined $10,000.00 and received a sentence of three years imprisonment on each count to run concurrently for a total of three years imprisonment and a $10,000.00 fine. Appellant White received a sentence on Count 1 of three years imprisonment and was fined $10,000.00. Appellant Giella received a sentence on Count 1 of five years imprisonment and was fined $10,000.00; on each of Counts 2 through 4, he received a sentence of ten years and was fined $10,000.00; on each of Counts 5 and 6, he received a sentence of ten years imprisonment and was fined $10,000.00; and on each of Counts 7 through 13, he received a sentence of five years imprisonment. Since each sentence was concurrent, Giella's total sentence amounted to ten years imprisonment and a $10,000.00 fine. From their convictions, each defendant now appeals. We affirm.

## FACTS

This case arises from a series of transactions in which appellants all played a material part involving the fraudulent sale of gold bullion during the last five months of 1980.

In August, 1980, Heffington, as president of Heffington-Norman Investments, Inc., a registered brokerage firm in Wichita Falls, Texas, contacted Billy Carr[1] to inquire about the possibility of attracting investors to purchase a large number of "miner's bars" of gold, which Heffington had heard Carr possessed and was trying to sell. The gold was allegedly stored at the Broward Commercial Warehouse in Fort Lauderdale, Florida, which was operated by co-defend-

---

1. William Carr was named along with appellants in the thirteen-count indictment as a co-defendant. Upon motion, however, his trial was severed from the instant one and, according to counsel at oral argument, a plea bargaining agreement was eventually entered into.

ant, Anthony Giella. In September, 1978, Carr delivered a large amount of product, allegedly gold, to the warehouse. According to Giella, Carr at that time showed him a bar from one of the many cases delivered into the warehouse which appeared to be gold bullion. From this, Giella asserts that he at all times believed that he was storing gold in the warehouse. According to the terms of the Carr-Giella storage agreement, Giella would receive a bonus of approximately $500,000.00 when and if the gold bullion were sold. With this inducement, Giella wrote warehouse receipts for Carr reflecting whatever Carr requested and with apparently no knowledge that there was any truth to the receipts.

In September, 1980, Heffington met Carr and others in McAllen, Texas, where they worked for several weeks in an effort to secure investors for the gold. While in McAllen, Heffington observed Carr draft two letters that purported to be from Giella as president of Broward Commercial Warehouse and purported to be to Heffington as president of Heffington-Norman Investments. These letters were typed on Broward Commercial Warehouse stationery and stated that Carr had released and transferred one hundred tons of gold to Heffington-Norman Investments and that the warehouse was awaiting Heffington's instructions concerning storage of the gold.

Having failed to secure investors in September, Carr and Heffington met with co-defendant, Russell White, at Terrell, Texas, in October, 1980. Heffington entered into a contract with White for the sale of 3,500,-000 ounces of gold, title to remain in Heffington until funds were received. Heffington also gave White a letter which purported to assign fifty-three containers of Heffington-Norman Investments, Inc.'s gold at Broward Commercial Warehouse to R. P. White & Associates as a guarantee of Heffington-Norman's performance under the contract. Attached to the letter were copies of the forged Giella letters from McAllen, Giella's phony Broward Commercial Warehouse receipts, Broward Commercial Warehouse bills of lading and an affidavit from Carr stating that the copy of the

warehouse receipts was a true copy of a certified warehouse receipt. Using these documents, White attempted to locate people who would invest in the gold. White lodged the documents with Sam Wagliardo at Security Trust Company in Dallas, Texas.

In December, 1980, White lined up several investors to purchase the gold. Thomas E. White of Seattle, Washington, tendered a $325,000.00 cashier's check to co-defendant R. P. White as his investment in the gold deal. William R. Wallace, together with Wesley T. McVey and an associated group of investors, agreed to invest $200,-000.00 into the gold. Since the purchase price was only $400,000.00, it was agreed that Security Trust Company would refund $125,000.00 to White after the transfer of the gold, giving each set of investors one-half interest in the gold. Both Wallace and Thomas E. White had examined the documents at Security Trust Company and relied upon them as evidence of the existence of the gold.

Defendant R. P. White received Thomas E. White's $325,000.00 cashier's check on Saturday, December 20, 1980, and deposited it the following Monday in his account at the American National Bank in Terrell, Texas. Within two days, White disbursed $225,000.00 to Carr, who transferred $125,-000.00 to Giella. The remaining $100,000.00 was spent by defendant White by December 30, 1980, for personal debts and real estate. Wallace and McVey made some seven wire transfers from Reno, Nevada, to Dallas of their funds on December 29 and 30, 1980. These transfers amounted to $155,000.00. The following day the remaining $45,000.00 in Wallace funds was received at Security Trust Company in the form of a cashier's check. Of this amount, Heffington took $150,000.00 on December 30, 1980.

It was agreed that the gold would be delivered by January 2, 1981. The investors, however, soon learned that there was a problem in the paper flow hindering delivery. On January 5, 1981, Heffington introduced Wallace and McVey to defendant

Carr for the first time. At this time Carr tendered to the investors a phony bill of lading and invoice which had been typed for him by Heffington stating that the gold had been flown to Canada for the account of Heffington-Norman Investments. Heffington observed Carr forge signatures on these documents. When the gold never turned up in Canada, the investors reported their loss to the FBI making criminal complaints against all persons associated with the transaction. Subsequent investigation resulted in the indictment of appellants.

## ISSUES

It is not surprising that after a lengthy trial by jury in the district court, a number of issues are raised on appeal. We set forth these issues according to the parties who have raised them.

### Issue Raised By All Parties

(1) Whether the trial court erred in denying the appellants' motion to dismiss the indictment based on prosecutorial misconduct before the grand jury.

### Issues Raised By Heffington And Giella

(2) Whether appellants' Fifth or Sixth Amendment rights were violated by the trial court's refusal to grant appellants' motion for "use immunity" for co-defendant William Carr.

(3) Whether the Double Jeopardy clause of the Fifth Amendment was violated by the conviction and sentence of the appellants on multiple "wire fraud" counts.

### Issues Raised By Heffington Only

(4) Whether the evidence was sufficient to support Heffington's conviction.

(5) Whether the district court erred in denying Heffington's motion for continuance allegedly to obtain "conflict-free" counsel.

(6) Whether Heffington's Sixth Amendment right of confrontation was violated by admission of a co-defendant's hearsay statement.

### Issues Raised By Giella Only

(7) Whether the evidence was sufficient to support Giella's conviction on the substantive counts since arguably such acts set out in the counts could not have been reasonably foreseen as the necessary or natural consequences of the unlawful agency of the conspiracy.

(8) Whether the trial court's jury instructions on conspiracy were adequate and proper.

(9) Whether the trial court erred in denying Giella's motion to strike testimony which was offered under the co-conspiratorial exception to the hearsay rule.

### Issue Raised By White Only

(10) Whether the evidence was sufficient to support White's conviction for conspiracy.

## 1. PROSECUTORIAL CONDUCT BEFORE GRAND JURY

Appellants assert that the district court erred in denying appellants' motion to dismiss the indictment for the reasons that (1) the Assistant United States Attorney uttered inflammatory and prejudicial remarks to the jury, commented on the evidence and violated the independence of the grand jury and (2) the prosecutor became a witness and testified during the presentation of the case to the grand jury and, thus, was an unauthorized person under Fed.R.Crim.P. 6(d)[2] in the grand jury room. It is to be noted that appellants' arguments are based upon only that portion of the grand jury record,

**2.** Fed.R.Crim.P. 6(d) provides:

Who May Be Present. Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting.

the testimony of FBI agent Eugene L. Gee, which was made available to appellants for review. The entire transcript of the grand jury testimony was sealed by the district judge and is contained within the record on appeal.

█ The Fifth Amendment to the United States Constitution provides that, "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of the grand jury." Nothing more is constitutionally required of an indictment than that it be "returned by a legally constituted and *unbiased* jury." *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397, 402–03 (1956) (emphasis added). The role of a prosecutor is to direct the grand jury in its investigation, but to avoid taking control of such inquiry. *United States v. Cosby*, 601 F.2d 754, 758 (5th Cir. 1979). Improper remarks made by a prosecutor can only justify dismissal of the indictment if such remarks so biased the grand jurors that their votes were based upon their bias. *United States v. Cathey*, 591 F.2d 268 (5th Cir. 1979).

█ The court has carefully reviewed the entire transcript of grand jury testimony and agrees with the district court that the actions of the prosecutor were clearly within the bounds of the prosecutor's role in a grand jury proceeding and that such actions could not have prejudiced or biased the grand jury in its independent role. It is evident from a reading of the entire text of discussion between the grand jurors and the prosecutor that the prosecutor's remarks to the effect that he thought he "could prove beyond a reasonable doubt" the elements set forth in the indictment had no prejudicial effect upon the grand jurors. The statement arose in a discussion concerning the process in which an indictment was drafted, and the prosecutor emphatically

admonished the grand jurors, "I mean this one hundred percent. Simply because I think [this], I don't want to influence your vote. You've got to vote extremely independently on this on your own conscience from what you've heard." Furthermore, the conveyance by the prosecutor of his impression as to the guilt or innocence of a defendant does not necessarily, and in this case did not, create a bias. *United States v. Cederquist*, 641 F.2d 1347, 1353 (9th Cir. 1981).[3] There is likewise no merit to other challenges by appellants of alleged inflammatory remarks by the prosecuting Assistant United States Attorney.

Nor do we agree with appellants' assertion that the prosecutor in his role directing the inquiry assumed the dual role of a witness and thereby became an "unauthorized" person under Fed.R.Crim.P. 6(d) when he remained before the grand jury performing his duties as prosecutor. In each of the three episodes cited by appellants, the prosecutor was summarizing testimony and evidence already before the grand jury and, in one case,[4] leading a witness to respond to a grand juror's question. These actions did not propel the prosecutor into the role of witness. Our review of the remaining grand jury testimony reveals no prosecutorial misconduct warranting dismissal of the indictment. Accordingly, appellants' first claim must fail.

## 2. DENIAL OF USE IMMUNITY

█ Appellants Heffington and Giella assert that the district court's refusal to grant use immunity to former co-defendant William Carr precluded them from introducing exculpatory evidence and violated their Sixth Amendment right to compulsory process and their Fifth Amendment right to due process (only Giella asserts the latter). In this case, prior to requesting the court to grant use immunity to Carr, appellants subpoenaed him to appear as a witness. Carr

---

**3.** In the words of the Ninth Circuit,

Grand jurors, as a practical matter, however, are aware that a case is being presented to them because the prosecutor feels that an indictment is warranted. Thus the fact that a prosecutor conveys such an impression to

the grand jury does not require the dismissal of the indictment.

641 F.2d at 1353.

**4.** See Grand Jury Testimony of Eugene L. Gee, 54–55.

moved to quash the subpoena and such was granted by the district court after considering appellants' request for use immunity. The subpoena was quashed because Carr's counsel indicated to the court that, if called, Carr would exercise his Fifth Amendment privilege against self-incrimination. Appellants assert that the refusal of the trial court to grant use immunity precluded them from presenting to the jury testimony which would have exculpated them. Such action, it is alleged, violated their Fifth and Sixth Amendment rights. Appellants urge this Court to adopt the five-prong test set forth by the Third Circuit in *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980) establishing when a district court should properly order use immunity. For the reasons below, however, we decline.

In *United States v. Herbst*, 641 F.2d 1161 (5th Cir. 1981), *cert. denied*, 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981), this Court, when faced with a similar allegation, expressly declined to follow the Third Circuit decision in *Virgin Islands* stating, among other things, that the Third Circuit view was the minority view. Indeed, even the *Virgin Islands* court recognized the serious intrusion into the realm of the Executive Branch presented by requiring a court to grant immunity. Keeping such in mind, this Court recently stated in *United States v. Thevis*, 665 F.2d 616, 639 (5th Cir. 1982), *cert. filed*, Docket No. 81–2073 (May 10, 1982):

> We conclude, however, after reviewing the various circuit opinions and conflicting policy arguments, that district courts may not grant immunity to defense witnesses simply because that witness has essential exculpatory information unavailable from other sources.

We do not believe, therefore, that the district court erred in refusing to grant use immunity to witness William Carr.

**5.** Pursuant to the concurrent sentence doctrine, *see United States v. Ortiz*, 610 F.2d 280 (5th Cir.), *cert. denied*, 445 U.S. 930, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980), we need not decide this

### 3. DOUBLE JEOPARDY

Heffington and Giella next assert that their convictions on multiple counts of wire fraud violated the Double Jeopardy Clause.[5] The particular transaction giving rise to these convictions was the multiple transfer of funds of investors Wallace and McVey from the First National Bank in Reno, Nevada to Republic National Bank in Dallas. Appellants assert that the intent necessary for conviction on each separate offense was not present since neither party foresaw nor intended the seven transfers to be made and had no control over the fact that the funds were transferred seven different times. Appellants further assert that the same identical evidence was offered on each of the separate counts and, therefore, under the test set forth in *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the absence of differing evidence on each count precluded multiple conviction.

The law is clear, however, that each separate use of wire communications constitutes a separate offense under § 1343. *United States v. Crockett*, 534 F.2d 589 (5th Cir. 1976); *Henderson v. United States*, 425 F.2d 134 n.4 (5th Cir. 1970). Furthermore, with respect to each of the wire fraud counts, separate records of separate and distinct wire transfers of funds from different investors were admitted into evidence to prove each separate offense. Accordingly, we find no double jeopardy violation.

### 4. SUFFICIENCY OF EVIDENCE–HEFFINGTON

Turning to those issues raised solely by appellant Heffington, he first contends that the evidence wholly failed to establish the essential elements of agreement or intent necessary to sustain his conviction. This contention is without merit. Viewing the evidence in the light most favorable to the Government and making all reasonable inferences and credibility choices which will support the verdict, *United States v. Escobar*, 674 F.2d 469, 476–77 (5th Cir. 1982), it

question. Since we find no merit to appellants' claim, however, we set forth our reasoning below.

is apparent that there is substantial evidence of guilt. The evidence established that Heffington was aware of the forged documents held in trust at the Security Trust Company and that he conveyed to others that these documents were valid. It was Heffington who demanded the investors to transfer $525,000.00 in funds rather than the $400,000.00 price originally agreed on. In contracts with White and Wallace, Heffington verified the authenticity of each document knowing such documents to be less than genuine. The jury's verdict with respect to Heffington is clearly supported by the record.

### 5. CONFLICT OF INTEREST

■ Heffington also contends that the trial court denied his Sixth Amendment right to counsel when it denied his motion for continuance. Heffington asserts that the purpose of requesting a continuance was to give him time to obtain conflict-free counsel. The facts as established by affidavits reveal that Heffington retained James Rolfe as counsel to represent him. At the time Rolfe represented Heffington, he was the nominee for the position of U. S. Attorney in the Northern District of Texas. Heffington asserts that his Sixth Amendment right to counsel entitles him to the services of an attorney who is untrammeled and can represent his client with unimpaired assistance, free of any detrimental conflict of interest. Such untrammeled representation, Heffington claims, is not possible where the attorney is anticipating confirmation to a position directly opposite that for which he was retained to represent the defendant.

Heffington's argument, however, contains a fatal flaw. The motion for continuance, read as a whole, simply does not reflect that appellant sought a continuance to obtain conflict-free counsel. Rather, the motion and accompanying affidavit quite vividly reveal that Heffington requested a continuance because he had only recently regained possession of his records which he needed in order to prepare his defense and because problems in his brokerage firm had consumed too much of his time to permit him to adequately prepare his defense. An accurate reading of the affidavit reflects that Heffington was informing the court that if his continuance were granted he would have to obtain new counsel since Rolfe would not be able to continue representing him following his confirmation as U. S. Attorney. Heffington never expressed any alarm or concern over a possible conflict, only that Rolfe acknowledged that appearance of a conflict would be avoided if appellant secured other counsel. Since there is no record of Heffington's belief that a conflict of interest existed, Heffington's claim must fall. The claim which Heffington raises now on appeal is one which was never presented to the district court. Rather, if appellant wishes to pursue his claim of conflict of interest, then an application for post-conviction relief pursuant to 28 U.S.C. § 2255 is available to him.

### 6. ADMISSION OF GIELLA'S HEARSAY STATEMENTS

Heffington finally argues that the district court's admission of certain out-of-court declarations of co-defendant Giella violated Fed.R.Evid. 801(d)(2)(E) (the "co-conspirator exception") and his Sixth Amendment right to confrontation as delineated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Specifically, the statements to which Heffington objects include Giella's testimony before the grand jury and his assertions to a special investigating FBI agent, David Israelson. According to appellant, this testimony revealed to the jury that Carr habitually filled out false warehouse receipts, bills of lading, and letters concerning the gold on warehouse stationery and that Giella signed his own name to the documents without any personal knowledge of the truth of the contents. This, appellant asserts, was the only direct proof that the gold actually did not exist or at least was never stored at the warehouse, and was the only evidence tending to show that the jointly tried co-defendants shared in the knowledge that the warehouse receipts were false.

■ Initially, we note that these statements which were introduced for consideration with respect to Giella only were not, as Heffington asserts, admitted under the co-conspirator exception of Fed.R.Evid. 801(d)(2)(E). They were clearly admissible as statements by defendant Giella pursuant to Fed.R.Evid. 801(d)(2)(A) and the district court so held.[6] Tr. Record 1519.

■ Furthermore, neither the testimony before the grand jury nor the statements to Agent Israelson violated the rule of *Bruton.* The testimony to which Heffington objects involved little or no reference to Heffington's participation in the scheme. The prosecutor was careful to avoid any references to Heffington which the jury might consider inculpatory. The district court was also mindful of the *Bruton* rule and indeed on one occasion instructed the prosecutor upon timely objection to move on so as to avoid a possible violation. The statements were highly probative in that they tended to establish Giella's knowledge of the fraudulent scheme, and they were clearly admissible for this purpose. "*Bruton* rights are violated only by admission of extrajudicial statements *implicating* the complaining defendants." *United States v. Castro*, 596 F.2d 674, 677 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979). In a case such as this, where a statement does not *directly* allude to the defendants, no rights are abridged. *See id.* and cases cited therein. Since we find no error in Heffington's trial and conviction, the judgment of the district court with respect to Heffington is AFFIRMED.

## 7. SUFFICIENCY OF EVIDENCE–GIELLA

■ Turning to those arguments raised solely by Giella, appellant first contends

that the evidence is insufficient to support his conviction on Counts 2 through 5 and 7 through 13 in that the record reveals no evidence indicating that the acts alleged in those counts could be reasonably foreseen as a necessary or natural consequence of the unlawful conspiracy. In *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court held that a conspirator could be found guilty of a substantive offense based upon acts of a co-conspirator done in furtherance of the conspiracy except where the act of the co-conspirator did not fall within the scope of the unlawful project or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement. Implicitly relying upon his position as operator of the warehouse and the fact that he never dealt with the purchasers in this transaction, Giella asserts that the record is devoid of any evidence which would support the jury's conclusion that he at any time had a basis in which to reasonably expect or foresee that the purchasers would travel in interstate commerce (Counts 2 through 4), that a cashier's check would be placed in interstate commerce (Count 5) or that the wire transactions (Counts 7 through 13) would ever take place. Appellant further claims that the most persuasive evidence indicating the insufficiency of the evidence to support the jury's verdict with respect to him is the fact that the jury found Russell White not guilty on the substantive counts. According to Giella, the evidence as to the participation and knowledge of Russell White in the alleged conspiracy is far more extensive and of greater weight than the minimal evidence of participation of Giella in the alleged conspiracy.

**6.** The district court gave no specific grounds for admitting such testimony at the time it was proffered. With respect to the testimony of Agent Israelson, the court merely overruled defense counsel's objection that Israelson's interview violated the defendant's *Miranda* rights. Defendant raises no similar objection on appeal. With respect to the grand jury testimony, defense counsel's objection can be read to

raise both co-conspirator and *Bruton* problems. The court's limiting instruction to the jury that such testimony was admissible only against the defendant Giella suggests that the court was admitting the evidence pursuant to Fed.R.Evid. 801(d)(2)(A). At the close of trial, the court reconfirmed this when making more precise "findings for the record." Tr. Record 1519.

The record, however, reveals that sufficient evidence existed to establish the foreseeability of the actions charged in the substantive counts as being the necessary or natural consequences of the unlawful agreement. First, testimony revealed the interstate nature of this transaction. Giella himself travelled to New York City in August, 1980 where he met Heffington and two gold contracts were signed. He travelled to McAllen, Texas in September, 1980, where he learned that Carr was negotiating various transactions with Mexican investors. Additionally, there was discussion with respect to gold transaction documents to be used in London. Giella himself directly caused four cashier's checks to travel in interstate commerce when he received them in Tyler, Texas, transported them to Florida and ultimately deposited them in New York bank accounts. The evidence of the national and international scope of this transaction, as well as the interstate movements of participants and funds, all of which was known to Giella, was clearly sufficient for the jury to find that the acts in all of the substantive counts were the reasonably foreseeable natural consequences of the conspiracy to defraud. The jury's verdict with respect to White is irrelevant.

## 8. THE CONSPIRACY INSTRUCTION

Giella next asserts that the district court erred in refusing to instruct the jury on the conspiracy count as requested by defendant in his proposed charge. The district court declined to submit the following charge to the jury: "mere knowledge, approval or acquiescence in the object or purpose of a conspiracy is insufficient to prove participation in it, and further, mere presence at the scene of a crime or mere association with members of a conspiracy is not enough to sustain a conviction for a conspiracy." Giella claims that had the court instructed the jury properly, the jury may well have found that he was merely present at the time of certain activities and only associated with members of the conspiracy without willfully and knowingly joining in it. The failure of the court to submit these charges

to the jury, Giella asserts, denied him a fair trial and due process under the Fifth Amendment.

 This contention is without merit. When reviewing a trial court's refusal to charge a requested instruction, we consider the jury charge as a whole in light of the evidence presented and arguments of counsel. *United States v. Kerley*, 643 F.2d 299, 303 (5th Cir. 1981). So long as the charge accurately reflects the law and facts, the district judge is vested with broad discretion in formulating his charge, and this Court will not lightly disturb his judgment. *United States v. Ruppel*, 666 F.2d 261 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 3487, 72 L.Ed.2d —— (1982). In this case, the court instructed the jury that they had to find that the defendant knowingly did an act which the law forbade and, that he knowingly and willfully joined in the unlawful conspiracy. The court additionally instructed the jury that "mere presence at the scene of the alleged transaction or event, or mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy but happens to act in a way which advances some object or purpose of the conspiracy, does not thereby become a conspirator." Read as a whole, it is clear that the court's instructions were proper.

## 9. CO–CONSPIRATORIAL TESTIMONY

 Giella finally contends that the district court erred in permitting the government to introduce testimony of co-conspirators Heffington and White against Giella. He claims that the district court improperly relied upon Giella's own statements as independent evidence when making the necessary findings dictated by this Court's opinion in *United States v. James*, 590 F.2d 575 (5th Cir. 1974),[7] supporting admissibility of

---

**7.** In *United States v. James*, the *en banc* court

addressed the issue of the effect of the then

the statements pursuant to Fed.R.Evid. 801(d)(2)(E).

Appellant's asserted error is controlled by this Court's holding in *United States v. Fredericks*, 586 F.2d 470 (5th Cir. 1978), *cert. denied* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979), where we stated,

> The Government must produce independent evidence both that the conspiracy existed and, with respect to any defendant co-conspirator against whom the statements are admitted, that he or she was a member of that conspiracy. The Government may use, however, *any* otherwise admissible evidence in meeting this threshold burden of production, *including*—with respect to any particular defendant—any out-of-court statements made by that defendant in the presence of a witness testifying under oath.

*Id.* at 475–76 (footnotes omitted; emphasis in original). There was no error in the district court's consideration of Giella's own statements as independent evidence that the conspiracy existed and that he was a member thereof. This evidence together with other evidence summarized by the trial court was sufficient to satisfy the *James* standard and the conditions for application of Rule 801(d)(2)(E). *See id.* Accordingly, the judgment of the district court with respect to defendant Giella is AFFIRMED.

## 10. SUFFICIENCY OF EVIDENCE—WHITE

Unlike co-defendants Heffington and Giella, Russell White was convicted only upon the conspiracy count; he was found not guilty on all substantive counts. White asserts that the evidence in this case

was insufficient to establish that he knew of or participated in the conspiracy and that the verdicts rendered by the jury are indicative of the lack of sufficient evidence. Appellant claims that his participation in the acts bringing about the fraud was evident in the record; therefore, the only basis for the verdicts of acquittal on the substantive counts was the lack of sufficient evidence to establish White's knowing and willful participation in the fraudulent scheme. Appellant contends that it is this same lack of evidence on the knowledge issue that is probative of his innocent participation in the conspiratorial scheme.

Appellant's assertions arguably raise some question as to the consistency of the jury's verdicts; however, we note that consistency of verdicts is not required. *United States v. Cargo Service Stations, Inc.*, 657 F.2d 676, 685 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). Moreover, rigid consistency of verdict is not necessary in a multicount indictment as long as the conviction is adequately supported. *United States v. Bottom*, 638 F.2d 781 (5th Cir. 1981). The evidence established that White netted approximately $100,000.00 from the conspiracy. It also established that White was aware that Heffington was merely an agent of Carr and that he neither owned nor controlled any gold. Notwithstanding this fact, White lodged various documents with Security Trust Company which he knew mistakenly reflected that Heffington-Norman Investments, Inc. had title and control of the gold. With these documents, White succeeded in persuading the victims in this suit to invest in the gold transaction.

newly-adopted Fed.R.Evid. 801 on the traditional co-conspiratorial hearsay exception. The court held that admission of co-conspiratorial statements is premised upon a showing (1) that a conspiracy existed; (2) that the statements were made in furtherance of the conspiracy, and (3) that the defendant and declarant were members of the conspiracy. The court further held that the existence of the prerequisites was to be determined by the trial judge. The court stated that, whenever reasonably practicable, the district judge should require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of

a co-conspirator. As a preliminary matter, the offering party must establish by substantial, independent evidence the existence of a conspiracy, at least enough to take the question to the jury. Regardless of whether the proof has been made in the preferred order, or the statement has been admitted subject to later connection, on appropriate motion at the conclusion of all the evidence the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself the necessary prerequisites to admission of the co-conspiratorial statements.

Viewing the evidence in a light most favorable to the government, we find the evidence sufficient to convict White, and accordingly, his conviction is AFFIRMED.