No. 56,343

STATE OF KANSAS, *Appellee*, v. YVONNE D. PINK, REGINA M. BALD-WIN, and ERICK L. KELLY, *Appellants*.

(696 P.2d 358)

Opinion filed March 2, 1985.

*Charles A. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, argued the cause and was on the brief for appellant Yvonne D. Pink.

*Steven C. Sherwood*, of Wichita, argued the cause and was on the brief for appellant Regina M. Baldwin.

*Kenton D. Wirth*, of Wichita, argued the cause and was on the brief for appellant Erick L. Kelly.

*James D. Hall*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general; *Clark V. Owens*, district attorney; and *Geary N. Gorup*, assistant district attorney, were on the briefs for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Yvonne D. Pink, Regina M. Baldwin and Erick L. Kelly (defendants-appellants) guilty of various felonies. All three defendants were jointly tried and convicted of one count each of first-degree (felony) murder (K.S.A. 21-3401) and two counts each of aggravated robbery (K.S.A. 21-3427). Baldwin and Pink were also convicted of two counts each of kidnapping (K.S.A. 21-3420), while Kelly was acquitted of this charge.

Numerous issues are asserted on appeal. All three defendants

contend the trial court erred by failing to disclose the identity of a paid Crimestoppers informant and by failing to grant a motion for judgment of acquittal. They also allege they were prejudiced by prosecutorial misconduct in the opening statement. Baldwin and Kelly contend the trial court erred by admitting certain out-of-court statements of Pink and Baldwin. Baldwin asserts, additionally, that the trial court erred in failing to sever the trials of the three defendants and in sentencing her under the Mandatory Firearm Sentencing Act (K.S.A. 21-4618) and that the sentence pronounced was not in compliance with the journal entry. Finally, Kelly asserts that he was denied his constitutional right of effective assistance of counsel.

At approximately 1:30 a.m. on May 3, 1983, a robbery occurred at Church's Fried Chicken restaurant located at 1302 North Broadway in Wichita, Kansas. The three employees — Julie Rosenhamer, Debra Rogers, and Jerrell Bell — were preparing to close when two armed robbers entered the restaurant. One of the robbers wore a purple scarf over the face and the other wore no facial covering. One of the robbers ordered Rosenhamer and Rogers, who were standing in the front part of the restaurant, not to move. Bell, who was working in the kitchen, came to the front when he heard the commotion and saw the robber in the scarf holding a gun on Rosenhamer and Rogers. The second robber pointed a gun at Bell and started to move him to the back of the store. The robber in the scarf ordered Julie Rosenhamer to get the money, but when she started to move the robber shot her in the chest. Julie fell to the floor with what later proved to be a fatal wound inflicted by a .22-caliber bullet.

Bell continued to move to the rear of the store as he was ordered; when he glanced back to the front he noticed the purple scarf had slipped from the robber's face and so he was able to see the face. The second robber then placed Bell in the cooler, and, soon thereafter, Rogers was placed inside with him. A short time later, one of the robbers ordered Rogers to come out of the cooler and open the cash registers. Rogers opened one register and gave the robber the register tray. The robbers then took her into the office and asked her to open the safe, but she informed them that the only employee who knew the combination was the one who had been shot.

Shortly thereafter, the robbers left by the back door while

Rogers was still in the office. Upon their departure, Rogers let Bell out of the freezer and they called the police. Before leaving with the police, Bell and Rogers noticed that a key ring which held keys to the restaurant was missing from where it usually hung by the back door. Also missing was Rogers' purse.

Two cash register drawers and a purse were located adjacent to the Kellogg Street overpass at I-135 by a member of the Kansas Department of Transportation. These items were submitted into evidence at trial. The cash drawers were identified as the missing drawers from Church's. Rogers identified the purse as her own. When these items were discovered, the money was gone from the drawers and the purse; also missing from the purse were some pearl earrings and a necklace belonging to Rogers. The total amount of cash taken from the restaurant was $118.29.

Bell and Rogers, in separate interviews with the police, described the robbers as a black male and a black female. Bell described the robber with the scarf who shot Rosenhamer as a female, between 5'4" and 5'6", wearing a purple scarf over her face and a blue bandana over her head. Bell described the robber who had led him to the cooler as a man who might have had a very light mustache wearing a waist-length leather jacket. Bell was able to prepare composite drawings of both robbers.

Rogers also believed the robber in the scarf was a female, but did not recall that she wore a blue bandana. Rogers described the "man" as wearing a long, brown leather coat. Rogers recalled hearing the robber in the scarf refer to the other as "Earl." Rogers was able to prepare a composite of the "man" only, as she never saw the face of the other robber.

Both Bell and Rogers were shown photo line-ups on several occasions. One of the line-ups contained pictures of Pink and Baldwin, but neither Bell nor Rogers was able to make an identification from the mugshots. At both the preliminary hearing and at trial, Bell and Rogers each made positive in-court identifications. Bell identified Baldwin as the person in the scarf and Pink as the person in the leather coat. Rogers identified Baldwin as the robber in the leather coat. Both Bell and Rogers testified that after seeing the defendants they realized they had been mistaken in thinking the robber in the leather coat was a man.

Defendant Kelly was present at the preliminary hearing, but

neither Bell nor Rogers testified as to having seen him the night of the robbery. After the preliminary hearing, Bell contacted the police to inform them that he remembered seeing Kelly outside Church's shortly before the robbery. At trial, Bell testified that he was adjusting a mirror in the lobby shortly before the robbery. While adjusting the mirror, he saw the defendant Kelly standing in the lot next to the store; Bell watched Kelly for a while because Kelly was not moving to enter the restaurant. When Kelly saw Bell watching him, he walked away. Bell made a positive in-court identification of Kelly.

On May 16, 1983, a confidential informant contacted the Crimestoppers office. This contact eventually led the investigation in a direction that ended with charges against the defendants. The exact nature of the information and the identity of the informant were never disclosed. The evidence at trial indicated that at some point after receiving the tip, the police contacted Donald Hicks and Kim Walker because their vehicle had been connected with the robbery. Both Hicks and Walker spoke to the detectives about their knowledge of the defendants. Hicks and Walker were living at the Sunset Motel in April and May of 1983. One night Kelly came to their room and asked to borrow their car. Walker remembers that Baldwin and Pink came in shortly after Kelly and all three returned together sometime later. Hicks remembers seeing only Kelly that night. Walker testified that when they returned they were carrying a lot of change wrapped in a newspaper. She observed that Baldwin had a .22-caliber pistol. She also noticed that someone had laid a set of pearl earrings and a drop pearl necklace on the dresser. She saw Kelly with some "green" money with which he and Hicks left in order to purchase drugs. Walker testified that while the men were gone, she heard Pink say to Baldwin, "I said don't move and they moved, so I shot them." Baldwin's only response was to shrug her shoulders. Later, after the men had returned, they all watched television. When the news report on the Church's Chicken robbery was broadcast, someone turned up the volume.

Walker admitted that she had been sleeping off the effects of amphetamines and alcohol when these events took place. Both she and Hicks were uncertain as to the day and time the events occurred.

On May 18, 1983, the police went to a liquor store owned and

operated by Baldwin's mother to contact Baldwin and Pink for questioning. Broken keys on a key ring, later identified as the restaurant's missing keys, were found in a pocket of Baldwin's waist-length, brown leather jacket. When Pink was interviewed, she provided an alibi that at the time of the robbery she was with Baldwin after having helped her close the liquor store; she denied ever having ridden with Kelly and Baldwin in Hicks' car. When police contacted Baldwin's mother, she said Pink never worked in the liquor store.

Baldwin consented to a search of her home, which produced a blue bandana that Bell later testified looked very much like the scarf the robber who shot Rosenhamer had worn over her hair.

None of the defendants testified at trial. Testimony was received from several State's witnesses as to self-incriminating statements made by Pink and Baldwin. The contents of such testimony and any additional facts will be developed when necessary to discuss the issues raised.

I.

Each of the three defendants challenge the court's refusal to compel the State to disclose the identity of the Crimestoppers confidential informant. They claim disclosure is required by K.S.A. 60-436 and that failure to disclose violates their constitutional right to confront witnesses.

The term "Crimestoppers" is used to describe the Wichita Crime Stoppers Program Inc., a not-for-profit Kansas corporation organized in 1980. Private funding supplies money which is used to pay rewards for information about crime. The media is used to inform the public of unsolved crimes and to inform them of the reward program. The advertising emphasizes that the informer need not give his or her name in order to collect the reward for information helpful in solving a crime. Officers of the Wichita Police Department answer all calls.

In the case at bar, a confidential informant reported information about the Church's Chicken homicide-robbery. The informant did not give his or her name to the detectives who answered the call, although one of the detectives recognized the informant from a prior contact. At a pretrial discovery hearing, the court received testimony from the two detectives and heard argument from counsel. The court then made an *in camera* inspection of the telephone logs of the Wichita Police Depart-

ment, audio tapes of conversations of the informant with police, and a written transcript of these conversations. The court found that the information provided by the informer was used for no other purpose than to focus the investigation in a direction that led to the arrest of these defendants. The information was not used as any part of the probable cause basis for the arrest warrant, nor was any search warrant utilized based on this information. The informant was not endorsed as a witness. The informant received a total reward of $1,000 for the information.

Based on all the information, the court denied the discovery request, but ordered that if the informer became a witness at trial then the fact that such person was a Crimestoppers informant, along with all statements relating to this case by such informer, would be furnished to the defendants.

The "informer's privilege" is codified in K.S.A. 60-436, which provides:

> "A witness has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a provision of the laws of this state or of the United States to a representative of the state or the United States or a governmental division thereof, charged with the duty of enforcing that provision, and evidence thereof is inadmissible, unless the judge finds that (a) the identity of the person furnishing the information has already been otherwise disclosed or (b) disclosure of his or her identity is essential to assure a fair determination of the issues."

The defendants on appeal claim that under subparagraph (b) of the statute, and under various constitutional provisions, they have been denied a fair trial. We disagree.

The rationale for the "informer's privilege" was discussed in the leading case of *Roviaro v. United States*, 353 U.S. 53, 1 L.Ed.2d 639, 77 S.Ct. 623 (1957). The court found that the privilege is founded upon public policy and seeks to protect the public interest in effective law enforcement; it recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officers, and, by preserving their anonymity, encourages them to perform that obligation; the privilege is designed to protect the public interest and not to protect the informer. 353 U.S. at 59-60.

The *Roviaro* court noted that two varieties of informers exist: those who provide the police with information that establishes probable cause, and those who actually participate in or observe criminal activity. Generally, the court is not required to disclose

the identity of informers in the first category. See *McCray v. Illinois*, 386 U.S. 300, 18 L.Ed.2d 62, 87 S.Ct. 1056 (1967); *State v. Robinson*, 203 Kan. 304, 454 P.2d 527 (1969); *State v. Braun*, 209 Kan. 181, 495 P.2d 1000, *cert. denied* 409 U.S. 991 (1972). The court formulated a balancing test that is to be applied to determine whether the identity of informers in the second category should be disclosed. The test requires weighing the public interest in protecting the flow of information and the individual's right to prepare his defense. Factors to be considered include the crime charged, the possible defenses available and the possible significance of the informer's testimony. *Roviaro*, 353 U.S. at 62. See also *State v. Knox*, 4 Kan. App. 2d 87, 603 P.2d 199 (1979).

It has long been the rule of this court that it is incumbent upon the defendant to show that the identity of the informer is material to his defense. *State v. Braun*, 209 Kan. at 186. The defendants have failed to show that the informer in this case fell within the second category and was material to their defense. The defendants argue that they cannot establish the necessary materiality without knowing who the informer is or what information was provided. They each speculate how the information or identity might benefit their defense. However, speculation and suspicion regarding what an informant might possibly testify to is not sufficient to require disclosure. *United States v. Halbert*, 668 F.2d 489 (10th Cir. 1982); *United States v. Buras*, 633 F.2d 1356 (9th Cir. 1980).

Although this evidentiary burden which is placed on the defendants appears to be very harsh, it is eased by the *in camera* disclosure to the court. If the judge had found a reasonable probability that the informant could give needed testimony, the government would have been required to disclose the informant's identity. *Knox*, 4 Kan. App. 2d at 99. However, the judge found *in camera* that the informant's testimony was not needed on the issue of guilt or innocence. This matter was properly within the discretionary power of the trial court. The decision will not be overturned absent an abuse of that discretion. *State v. Nirschl*, 208 Kan. 111, 115, 490 P.2d 917 (1971). Discretion is abused only where no reasonable man would take the view adopted by the court; if reasonable men could differ as to the propriety of the action taken by the court, then it cannot be said the court abused the exercise of its discretion. *State v. Wilkins*,

220 Kan. 735, 556 P.2d 424 (1976). We can find no abuse in the exercise of discretion either in the court's decision or in the manner in which the court reached its decision. The Tenth Circuit has held that an *in camera* hearing on the discoverability of an informer, conducted without the presence of the defendant or his counsel, is not an abuse of discretion. *United States v. Perez-Gomez*, 638 F. 2d 215 (10th Cir. 1981).

Also, it is immaterial that a judge other than the one who presided at trial ruled on this preliminary matter.

We are satisfied that the informant was a mere "tipster" whose information precipitated the investigation that led to the defendants' arrest. That fact alone is insufficient to compel disclosure of the information. *United States v. Buras*, 633 F.2d 1356; *Bourbois v. United States*, 530 F. 2d 3 (5th Cir. 1976); *State v. Grider*, 206 Kan. 537, 479 P.2d 818 (1971). There was no error in the trial court's refusal to disclose the informant's identity.

## II.

Each of the defendants allege they were prejudiced by certain statements made by the prosecutor in his opening argument. Each defendant frames his or her argument in a different manner and each complains of different comments made by the prosecutor.

Pink's argument is simply that she was prejudiced by these comments. Baldwin argues the court erred in overruling the defendants' motion to preclude the prosecutor from making comments about out-of-court statements of Pink and Kelly. Kelly argues that the comments denied him his constitutional right to confront witnesses. Based on these arguments, we must determine if the comments made by the prosecutor, when taken as a whole, were so prejudicial as to deny any of the defendants a fair trial.

Each of the defendants complains about the following comments: that Kelly made some unspecified statements to a man named Archie Henderson "about his, Erick Kelly's, involvement"; a contact by codefendant Baldwin to the Alcohol, Tobacco and Firearms Agency on the evening of May 2 about a gun belonging to codefendant Kelly which was for sale; the relationship by which Baldwin related to Pink "basically as a man." Additionally, Pink complains of the prosecutor's statement that a scarf found in Baldwin's room was recognized by Bell and that

there would be evidence that the codefendants borrowed a car on the night of the robbery. Baldwin objects to the comments about Pink admitting to having shot someone (these statements were admitted into evidence at trial). Kelly additionally complains that he was prejudiced by the statements concerning Bell's observation of him the night of the robbery and by the summarization of Bell's and Walker's testimony in final argument.

Prior to the opening statement, Pink's counsel requested the court to order the prosecutor not to mention anything which might be inadmissible under the *Bruton* rule and counsel for Baldwin joined in the motion. The court overruled the motion.

The State argues that the defendants have not preserved this issue for appeal as they failed to make contemporaneous objections during the prosecutor's opening statement and final argument. We cannot agree as to the opening statement. The defendants did not know which comments the prosecutor would fail to establish through the evidence at trial; therefore, they could not have known when to object. However, defendant Kelly also complains of certain statements made during closing argument. His failure to contemporaneously object to statements in the final argument precludes his complaint on appeal. *State v. Watkins,* 219 Kan. 81, 87-88, 547 P.2d 810 (1976).

Having reviewed the prosecutor's opening statement, we find there was no prejudice to any of the defendants caused by the opening statement. The jury was instructed that statements of counsel were not to be considered as evidence. We must assume the jury followed this instruction and disregarded any remarks of counsel which were not later established by the evidence. *State v. Fleury,* 203 Kan. 888, 896, 457 P.2d 44 (1969).

Absent substantial prejudice to the rights of the defendant, there must be a showing of bad faith on the part of the prosecutor before relief may be granted as a result of a prosecutor's reference in his opening statement to matters not provable or which he does not attempt to prove during the trial. *State v. Woods,* 218 Kan. 163, 542 P.2d 319 (1975); *State v. Campbell,* 210 Kan. 265, Syl.¶ 9, 500 P.2d 21 (1972). See also 1 ABA Standards for Criminal Justice, Prosecution Function, Standard 3-5.5. We find the prosecutor made a good faith effort to present all evidence alluded to in his opening remarks. The defendants have failed to meet their burden of showing bad faith.

Baldwin objects to comments concerning statements made by Pink to third parties about a shooting. These statements were offered and entered into evidence at trial. There is no prejudice suffered by the defendant (Baldwin) in regard to these comments which were established by the evidence. *State v. Hill*, 211 Kan. 287, 297-98, 507 P.2d 342 (1973).

### III.

The codefendants Baldwin and Kelly each challenge the admission of out-of-court statements made by Pink and Baldwin respectively. The admissibility of these statements has been challenged upon grounds of hearsay and the confrontation clause within the meaning of *Bruton v. United States*, 391 U.S. 123, 20 L.Ed.2d 476, 88 S.Ct. 1620 (1968). A hearing was held prior to the admission of any of this testimony into evidence. The court ruled that this was not a *Bruton* situation and allowed the testimony of Kim Walker, Youlanda Burrell, Karen Sherman and David Strong along with limiting instructions to the jury that each codefendant's statements about which the witnesses testified could only be used in considering the charges against that codefendant.

Kim Walker testified that after the three defendants returned on the night they borrowed her husband's (Hicks') car, she heard Pink say to Baldwin, "I said don't move and they moved so I shot them." Walker further testified that Baldwin responded by shrugging her shoulders. The court instructed the jury that this testimony was to be considered only in regard to the charges against Pink. Both Baldwin and Kelly objected at trial and claim error on appeal.

Youlanda Burrell, defendant Pink's cousin, testified that Pink told Burrell that she (Pink) had done something she should not have done — she had shot someone. Soon after saying this, Pink told Burrell she had been lying. Burrell also testified that Pink later told her that when she closed her eyes she could see the girl fall. Karen Sherman, Burrell's roommate, testified that Pink made a similar statement to her about seeing a girl fall. The trial court again instructed the jury that these statements could only be used in considering the charges against Pink. Both Baldwin and Kelly objected and now claim error.

Kelly also objects to the testimony of David Strong. Strong's

testimony was that sometime after the robbery, he had gone with Pink and Baldwin to retrieve a gun which belonged to him and which some man had. The man wanted $200 for the gun. Strong refused to pay that amount and Baldwin told him that the gun was "hot" and that the gun had been used and that Baldwin needed Strong to get the gun back. Strong asked why the gun was "hot" and Pink told Baldwin she shouldn't be talking. Strong then exclaimed that the next thing Baldwin would tell him was that the gun was used at Church's. Baldwin said "no" and left. The trial court instructed the jury that these statements could only be used in its deliberations against Baldwin.

Defendants Baldwin and Kelly argue that these statements are highly incriminating to them, that it is impossible for the jury to follow the limiting instruction, and, therefore, their right to confrontation has been violated within the meaning of *Bruton v. United States*, 391 U.S. 123. In *Bruton*, the Supreme Court held that an accused's right of confrontation, secured by the Sixth Amendment to the United States Constitution and applied to the states through the Fourteenth Amendment, is violated when the confession of a codefendant, implicating the accused, is received in evidence in a joint trial, even though the trial court admonishes the jury not to consider the confession in determining the guilt or innocence of the accused.

In *Bruton*, the statement admitted was a post-arrest confession to the police in which the codefendant stated the defendant (Bruton) had been his accomplice in an armed robbery. In reversing Bruton's conviction, the court reasoned:

"[B]ecause of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of . . . [the] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." 391 U.S. at 126.

The court also stated that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions . . . . [Citations omitted.] It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information." 391 U.S. at 135. Based on this language, courts interpreting *Bruton* have limited it to its facts. See *Dutton v. Evans*, 400 U.S. 74, 85-90, 27

L.Ed.2d 213, 91 S.Ct. 210 (1970); *United States v. Brock*, 667 F.2d 1311 (9th Cir. 1982); *United States v. Kiefer*, 694 F. 2d 1109 (8th Cir. 1982). Similarly, this court has held that the *Bruton* rule does not apply to all extrajudicial statements by codefendants introduced in a joint trial. See *State v. White & Stewart*, 225 Kan. 87, 587 P.2d 1259 (1978).

In the case at bar, it is undisputed that the statements admitted were hearsay. However, they fall within an exception to the hearsay rule and, accordingly, were properly admissible against the declarants as statements against interest. This exception is found in K.S.A. 60-460(j) which provides:

> "Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:
>
> . . . .
>
> "*Declarations against interest.* Subject to the limitations of exception (f), a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable man in the declarant's position would not have made the statement unless the man believed it to be true."

Each of the statements was inadmissible hearsay to the codefendants other than the declarant. Recognizing this, the court limited the jury's consideration of the statements to the respective declarant.

Up to this point, *Bruton* is indistinguishable: *Bruton* involved a confession which was admissible against the declarant but not against the codefendant, so the court admitted it along with a limiting instruction. However, in *Bruton*, the statements admitted explicitly referred to and incriminated the codefendant. It is this point that distinguishes *Bruton*. In none of the statements admitted in the present case did the declarant mention either of her codefendants.

*Bruton* rights are violated only by admission of extrajudicial statements *implicating* the complaining defendants. In a case such as this where a statement does not directly allude to the defendants, no rights are abridged. *United States v. Heffington*, 682 F.2d 1075 (5th Cir. 1982); *United States v. Castro*, 596 F.2d 674 (5th Cir.), *cert. denied* 444 U.S. 963 (1979). This was not a

situation where the prejudicial effect of the statements was great enough to make it impossible for the jury to comply with the limiting instruction. Here, we can assume that the jury did follow the instruction. Therefore, this was not a *Bruton* situation and no error was committed.

Baldwin's contention that she was prejudiced by Walker's testimony deserves a special note. Walker testified that in response to what Pink said about the shooting, Baldwin shrugged. This shrug was clearly a statement against her own interest. Therefore, Walker's testimony fell within a hearsay exception as to Baldwin. See K.S.A. 60-460(j). Where the incriminating admissions are admissible against the defendant under the rules of evidence, *Bruton* is inapplicable. *Folston v. Allsbrook*, 691 F.2d 184 (4th Cir. 1982).

We also note that defendant Kelly's reliance on *State v. Myers*, 229 Kan. 168, 625 P.2d 1111 (1981), is misplaced. In *Myers*, the State sought to admit a hearsay statement made by the defendant's deceased accomplice which implicated the defendant. This statement was to be used in considering the charges against the defendant — it was not a joint trial where the statement was admitted along with a limiting instruction to *not* consider it as to the defendant. This court in *Myers* found that, although there was a hearsay exception through which to admit the statement, its admission would violate the defendant's Sixth Amendment right to confront witnesses. In the present case, the right of confrontation has been protected through the use of the limiting instruction.

The court did not err in admitting the statements.

## IV.

Defendant Baldwin alleges the trial court erred in failing *sua sponte* to order severance when the *Bruton* problems became apparent. We have already determined there were no *Bruton* problems. Moreover, the defendant failed to request a severance and under K.S.A. 22-3204 such failure is deemed a waiver to the right of severance. *State v. Pham*, 234 Kan. 649, 651, 675 P.2d 848 (1984). This issue is without merit.

## V.

Each of the defendants contend the trial court erred by failing to grant their post-trial motions for judgment of acquittal. All three defendants allege there was insufficient evidence to sup-

port the verdict as to the element of identity. Defendant Baldwin also claims there was insufficient evidence to support the kidnapping conviction.

In a criminal action, when the defendant challenges the sufficiency of the evidence to support a conviction, the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained. *State v. Pham,* 234 Kan. at 667-68; *State v. Douglas,* 230 Kan. 744, 745-46, 640 P.2d 1259 (1982).

Each of the defendants was identified in court by one or both of the victims. In the instructions, the jury was cautioned on the reliability of eyewitness identifications. It is the jury's function, and not an appellate court's, to weigh evidence and pass on the credibility of witnesses. *State v. Holt,* 221 Kan. 696, 561 P.2d 435 (1977).

Aside from the in-court identifications, considerable evidence, albeit circumstantial, linked the defendants with the crime. A conviction of even the gravest offenses may be sustained by circumstantial evidence. *State v. White & Stewart,* 225 Kan. 87, Syl. ¶ 14. The victims, Walker, Burrell and Sherman, all gave testimony that linked the three defendants to the crime. The jury was instructed on the weight and credit to give witnesses. They chose to believe the State's evidence. We have reviewed all of the evidence and find that, even though the evidence was not overwhelming, it was sufficient to support the jury's verdict.

Likewise, we find there was sufficient evidence to support the verdict convicting Baldwin of two counts of kidnapping. The two robbers first placed Bell in the cooler and then Rogers, while they set about robbing the restaurant. They later removed Rogers so she could help them open the cash registers.

K.S.A. 21-3420 provides in pertinent part:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

. . . .

"(b) To facilitate flight or the commission of any crime.

The forcible moving of the victims to the cooler in order to

facilitate the robbery was clearly a kidnapping within the meaning of the statute and *State v. Buggs,* 219 Kan. 203, 547 P.2d 720 (1976).

### VI.

Defendant Baldwin next contends that the sentence pronounced by the trial judge did not match the sentence in the journal entry insofar as the imposition of the Habitual Criminal Act. She alleges the court erred by failing to reform the journal entry and, therefore, she should receive the minimum available sentence.

Defendant Baldwin does not contest the fact that the prosecution requested the application of the Habitual Criminal Act in sentencing, that defense counsel stipulated to the prior felony conviction, or that counsel for defendant and prosecution specifically argued the application and practical effect of the Habitual Criminal Act to the defendant's Class A and Class B convictions.

We have read the statement made by the trial judge in sentencing Baldwin and find it clear that the court doubled the maximum Class B penalties in each of the Class B sentences by virtue of the Habitual Criminal Act, and did not double the Class A penalty because doubling a life penalty would be an exercise in futility. Baldwin argues that the court sentenced without enhancement under the Habitual Criminal Act. The defendant's position is simply not supported by the record. The journal entry correctly reflects the sentence as imposed at the sentencing hearing.

### VII.

Defendant Baldwin's final contention is that the court erred in imposing the provisions of the Mandatory Firearm Sentencing Act as to the murder count. She claims that since evidence demonstrates Pink fired the only bullet, Baldwin was a mere accomplice and did not *use* a firearm in the commission of this crime as contemplated by the provision of K.S.A. 21-4618 which provides:

"(1) Probation or suspension of sentence shall not be granted to any defendant who is convicted of the commission of the crime of rape, the crime of aggravated sodomy or any crime set out in article 34 of chapter 21 of the Kansas Statutes Annotated in which the defendant *used any firearm* in the commission thereof and such defendant shall be sentenced to not less than the minimum sentence of

imprisonment authorized by law for that crime. This section shall apply only to crimes committed after the effective date of this act. This section shall not apply to any crime committed by a person under eighteen (18) years of age." (Emphasis added.)

Baldwin was convicted as a principal to the crime of felony murder. The evidence established that both robbers were armed. The sentencing court specifically found that both robbers used a firearm in the commission of these crimes. We will not disturb this finding as it is supported by competent evidence. *State v. Mack*, 228 Kan. 83, 85, 612 P.2d 158 (1980).

## VIII.

Finally, defendant Kelly raises (for the first time) on appeal that he was denied his constitutional right to effective assistance of counsel. Kelly cites certain acts and omissions which resulted in allegedly inadequate representation including failure to request severance, the waiver of an opening statement, abbreviated closing statements and inadequate efforts in cross-examination.

The State maintains that since the trial court was never given an opportunity to consider this issue, it is not properly before the appellate court. This rule is stated in *State v. Porter, Green & Smith*, 228 Kan. 345, 615 P.2d 146 (1980). However, in order to prevent a denial of fundamental rights, we may consider this issue on appeal. *State v. Puckett*, 230 Kan. 596, 598-99, 640 P.2d 1198 (1982). Since defendant Kelly received a new court-appointed counsel to represent him on appeal, we think it best serves the ends of justice to consider this issue raised by the newly appointed counsel.

In the recent case of *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985), this court adopted the two-part test of *Strickland v. Washington*, 466 U.S. _____, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984), to determine whether a criminal defendant has received effective assistance of counsel under the Sixth Amendment as follows:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.
"(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assist-

ance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

"(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 236 Kan. 650, Syl. ¶ 3.

In *Strickland,* the court said that the first component of the test — determining whether counsel's performance was deficient - need not be considered before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. 80 L.Ed.2d at 699. The court made it clear that the burden is upon the defendant to establish both requirements of the test, and that failure to establish one precludes any finding of ineffective assistance of counsel. The ultimate focus is the fundamental fairness of the challenged proceeding; in each case "the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." 80 L.Ed.2d at 699. Accordingly, if we can determine in this case that Kelly received a fair trial, then we need not conclude that his counsel's conduct was or was not unreasonable.

Here, it appears the mistakes complained of were slight and that, even without the alleged mistakes, the defendant would have been convicted based upon the evidence against him. Specifically, the failure to request severance was harmless error because the five grounds for severance recently stated in *State v. Martin,* 234 Kan. 548, 673 P.2d 104 (1983), were not present in this case. The defense counsel's decisions to reserve his opening statement and to abbreviate his closing arguments were reasonable defense tactics. See *State v. Crossman,* 229 Kan. 384, 390, 624 P.2d 461 (1981). Further, after reviewing the record we cannot find the defense counsel was inadequate in cross-examining witnesses, or, if he was, that his prejudiced the defend-

ant. All witnesses were extensively examined by both counselors for the two codefendants as well as being examined by Kelly's attorney. Moreover, there was sufficient evidence to support Kelly's conviction.

Therefore, we find that the result of this proceeding would have been the same even without the alleged errors. The defendant was not denied his Sixth Amendment right to effective assistance of counsel.

The judgment of the lower court is affirmed.