**Erick L. KELLY, Plaintiff–Appellant,**

v.

**Raymond ROBERTS and Attorney General, State of Kansas, Defendants–Appellees.**

No. 92-3366.

United States Court of Appeals, Tenth Circuit.

July 6, 1993.

A. Kimberley Dayton (B. Kay Huff with her on the briefs) University of Kansas School of Law, for plaintiff-appellant.

John K. Bork, Asst. Atty. Gen., for defendants-appellees.

Before LOGAN, McWILLIAMS, and MOORE, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

In 1983, Erick Kelly was convicted in Kansas State Court of felony murder and aggravated robbery. After exhausting his state court remedies, he filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Mr. Kelly advanced three grounds for relief in his habeas corpus action, including a claim the State failed to present sufficient evidence to support his conviction in violation of the Fourteenth Amendment. The district court dismissed the petition with prejudice, and the petitioner now raises the same issues on appeal. 804 F.Supp. 145 (1992). We have reviewed the state trial record thoroughly and conclude the evidence was insufficient to support a finding of the essential elements of the crimes beyond a reasonable doubt.[1] Therefore, we reverse the district court's decision and order the granting of the petition for a writ of habeas corpus.

I.

At approximately 1:30 a.m. on May 3, 1983, two armed robbers entered a Church's Fried Chicken restaurant on North Broadway in Wichita, Kansas. Shortly after entering the restaurant, one of the robbers shot and killed the manager. The robbers then ordered the two remaining employees, Debra Rogers and Jerrell Bell, to stand in the freezer. A few minutes later, one of the robbers called Ms. Rogers out of the freezer to assist in opening

1. In light of our holding on the sufficiency of the evidence claim, it is unnecessary to reach Mr. Kelly's remaining claims of ineffective assistance of trial counsel and withholding of exculpatory evidence.

the safe and cash registers. After she gave them one cash register drawer, the robbers left the restaurant through the back door. Ms. Rogers later noticed a set of restaurant keys, normally hanging from the back door lock, and her purse, containing pearl earrings and a necklace, were missing.

Regina Baldwin, Yvonne Pink, and the petitioner were arrested and charged with one count of felony murder, two counts of aggravated robbery, and two counts of kidnapping. At the preliminary hearing, and again at the trial of all three defendants, Ms. Rogers identified only defendant Baldwin as one of the robbers. Mr. Bell identified both Baldwin and Pink as the robbers. Neither employee's preliminary hearing testimony in any way implicated the petitioner in the robbery.

To establish the climate in which Mr. Kelly was tried, we note the State, in opening argument, emphasized purported evidence against him which it never introduced at trial. Specifically, the prosecutor stated:

> Mr. Kelly is . . . picked up in the course of this investigation and he is placed in a jail cell and knows as it turns out one of the individuals that's in that particular cell and there are other people in there as well. One of those other people is named Archie Henderson and he hears Mr. Kelly make some statements to other people there about his, Erick Kelly's, involvement.

Archie Henderson did not testify at the trial. The prosecutor also related evidence concerning the petitioner's possession of a gun.

> I suspect there will also be some evidence about Regina Baldwin making contact by telephone with the Alcohol, Tobacco and Firearm's Agency of the federal government on the evening of May the 2nd, later in the evening, that she has a gun, . . . actually Erick Kelly is the one that had it, and it is for sale for two hundred dollars. . . . [T]he evidence will be from other individuals that this gun belonged to at one time an individual named David Strong who loaned it to Mr. Kelly. . . .
>
> . . . .
>
> . . . [I]t was a three fifty-seven that Mr. Strong gave to Kelly. And this was some ten days to two weeks before May the 2nd.

> Now, Mr. Strong saw that gun on one other occasion, but he spent a lot of time looking for it with Erick Kelly and also with Yvonne Pink and Regina Baldwin. During this time, that is, about . . . May the 2nd, he never . . . got his gun back for whatever reason. There is no accusation being made of any specific wrongdoing with regard to that gun. . . . But merely to explain these occurrences, insofar as they pertain to the Church's Fried Chicken robbery and murder.

The State did not present any testimony regarding contact between Baldwin and the Bureau of Alcohol, Tobacco and Firearms. Moreover, although David Strong testified he went with Baldwin and Pink to look for his gun, he never linked the gun to Mr. Kelly in any way.

During the trial, Mr. Bell supplied the key testimony against the petitioner. He identified the petitioner as the person he saw in the parking lot of the restaurant "a little bit before the robbery." The manager had instructed Mr. Bell to fix a mirror located in the corner of the restaurant dining room. He claimed while he was in the dining room he saw Mr. Kelly. In response to the prosecutor's direct examination, Mr. Bell specifically testified:

> Q. Now, where did you see that person?
>
> A. Okay. Then when I first saw the person it was up here.
>
> Q. So you were looking through the—
>
> A. I was looking through the window.
>
> Q. Was anybody with him?
>
> A. No.
>
> Q. How good a look did you get at him?
>
> A. I watched him for a long period of time because when I was fixing the mirror and then I glanced at him, as I was fixing it and he was right here and then he moved around like this and then I stopped and watched him and then he saw me watching him and I kind of moved back like this and then he went on around and I watched him. I came down and watched him as he went on back this way.
>
> . . . .

Q. Oh, okay. And now did your eyes meet?

A. Yes.

Later in his testimony, Mr. Bell stated he heard the two robbers running when they left the restaurant.

Q. What direction was the sound of those foot steps?

A. It was going towards 12th Street. . . .

. . . .

Q. All right. Toward the back of the store?

A. Back of the store toward the fence.

Q. Now, what direction did you see Mr. Kelly here go?

A. Okay. He went down the side, 12th Street. Well, he went down the side of the parking lot parallel with 12th Street.

Q. Was it in the direction of the fence?

A. Yes, it was.[2]

Mr. Bell was not sure of the petitioner's identity and did not recognize him at the preliminary hearing because that was the first time he had seen the petitioner since the robbery. At the time of the robbery, Mr. Bell testified, the person in the parking lot had braided hair or was wearing some kind of cap. In contrast, at the preliminary hearing, the petitioner "had his hair out." Mr. Bell thought the petitioner looked familiar, however, and after the preliminary hearing, he realized where he had seen the petitioner. Mr. Bell then attempted to contact a police officer and eventually spoke to a detective two or three weeks after the hearing.

On cross-examination, Mr. Bell stated:

Q. When you saw Erick Kelly outside on May the 3rd of '83, the store, what was he wearing?

A. It was a—it was a jacket and pants, matching. I believe it was Khaki.

Q. Khaki pants?

A. Yes.

Q. Did you see a car?

A. No.

Mr. Bell also admitted the police showed him a mug shot of the petitioner before the preliminary hearing and he did not identify him as being involved in the robbery.[3]

Kim Walker, an acquaintance of the three defendants, provided the only other testimony ostensibly linking the petitioner to the robbery. In April and part of May 1983, Ms. Walker was living at the Sunset Motel in Wichita, Kansas, with her husband, Donald Hicks, and her son. She testified that at some indefinite point during her stay at the Sunset Motel, when she was in the room with Mr. Hicks and her son, the petitioner entered with Baldwin and Pink. The petitioner asked to borrow Mr. Hicks' car and then left with Baldwin and Pink. On direct examination, Ms. Walker stated she could not remember the day or the date on which this occurred. She also could not recall what time of day the petitioner came to the room because she was sleeping when he arrived and did not look at the clock.

Ms. Walker testified she went back to sleep after the petitioner, Pink, and Baldwin left and woke up when all three of them returned to the room. She did not know what time they returned. Shortly after the petitioner arrived with Pink and Baldwin, he went out with Mr. Hicks to buy some drugs. Ms. Walker testified:

Q. Now, before Erick and [Hicks] left what, if anything, happened after the three of them got back?

A. What happened.

Q. Yes.

A. Uh, they counted some change.

---

2. Although the quoted testimony tends to give the impression Mr. Kelly and the two robbers ran away from the restaurant at the same time, the entire context of Mr. Bell's testimony indicates he saw Mr. Kelly walk towards 12th Street before the robbers entered the restaurant. Moreover, as the quoted testimony demonstrates, Mr. Bell did not see the two robbers leave the restaurant; he was standing inside the freezer and heard footsteps that he assumed belonged to the two robbers.

3. During redirect examination, the prosecutor asked Mr. Bell:

Q. And who were the police asking you about when they showed you the photographs?
A. They were asking about the two people that entered the store.
Q. Now, did Mr. Kelly here enter the store?
A. No.

Q. Who did?

A. I don't remember who counted it. It was just counted.

Q. Where did they have the change?

A. In a newspaper.

Q. What kind of change?

A. Silver and pennies.

Q. And where was this done?

A. On the bed, I believe.

Q. Did you see any firearms during that time?

A. I saw a .22.

Q. Where?

A. Regina had it over in the corner by the dresser.

. . . .

Q. Where was Mr. Kelly at that time?

A. He was sitting in front of the ice box talking to [Hicks], I think. I'm not sure. I don't know.

. . . .

Q. Now, did you see any jewelry?

A. Yeah.

Q. What was that?

A. It was two pearl earrings and a necklace to match, I guess.

. . . .

Q. Who had that?

A. I don't know. It was just everything was just laid on the dresser.

Q. All right. And did you see any keys?

A. Yes.

Q. Who had the keys?

A. Regina had the keys.

. . . .

Q. On this—in this newspaper, where the change was, were there any bills that you saw?

A. No, no, green, no.

Q. Did you see any green on any of them when they came back?

A. Erick had some money when he—I don't know if he had it when he—he might have had it when he left. I don't know.

Q. You mean when he and [Hicks] left?

A. Yeah.

Q. When was it that you saw him with that money after the three of them came back and before he and [Hicks] left?

A. Yeah, before him and [Hicks] left.

Soon after the petitioner and Mr. Hicks returned to the motel room, someone turned on the television. Ms. Walker stated they did not really watch television until the news broadcast began.

Q. Now, do you remember when that was? What time it was?

A. No.

Q. Do you remember what was on the news?

A. I remember just one deal and that was Church's Chicken report. I remember that. That's all.

Q. Why do you remember that?

A. Because that's what everybody paid attention to.

Q. Any when you say everybody who are you talking to?

A. Regina, [Pink], Erick, me and [Hicks]. The television got turned up when that part of the news report came on TV.[4]

On cross-examination, Ms. Walker clarified she did not remember the month, day, or time the petitioner borrowed the car because she had been sleeping off the effects of speed and alcohol for approximately twenty-four hours. However, she admitted she thought the petitioner, Baldwin, and Pink borrowed the car before 10:00 p.m. and returned to the

---

4. Ms. Walker also testified they saw a second news report which included composite sketches of the robbers. She stated:

Q. Was anything—who was with you when you saw the newscast with the drawing?

A. I think Erick. Everyone was in the room, I think.

Q. You are not sure though?

A. No.

Q. Are you—do you recollect specifically anybody being in the room at the time?

A. Not really. I just—I think everyone was there who was there from the beginning.

Ms. Rogers' and Mr. Bell's testimony indicates the police did not make the composite sketches until at least the day after the robbery. Ms. Rogers testified she went to the police station to create the composite sketches of the two armed robbers on the morning after the robbery. Mr. Bell stated he worked on the composite sketches with a police officer a "couple" of days after the robbery.

room before midnight, prior to the time of the crime. Ms. Walker also testified she did not see anyone wearing Khaki pants on the night the petitioner borrowed the car.

Donald Hicks gave a strikingly different description of the last time he loaned his car to the petitioner. While he was living at the Sunset Motel with Ms. Walker and her son, the petitioner came to the room alone, shortly before midnight, and asked to borrow the car.[5] Mr. Hicks, who was in the room with Ms. Walker and her son, tossed him the keys and the petitioner left. The petitioner came to the room by himself early the next morning, returned the keys, and headed to his own room at the motel. About half an hour later, Mr. Hicks and the petitioner went for a ride in Mr. Hicks' car. After a short ride, they returned to the motel at eight or eight-thirty in the morning. Mr. Hicks testified he did not see Baldwin or Pink on the day the petitioner returned the car keys.

In closing argument, the State explained the theory of its case against the petitioner. The evidence demonstrated, the State argued, the petitioner aided and abetted Baldwin and Pink in the commission of the aggravated robbery. Specifically, the State contended:

> It's a question submitted to you in the language of the instructions, ... that anyone who helps in the escape is liable for the crime from which the escape was made because the escape is part of the commission of the crime. *And I'll submit to you that Mr. Kelly was operating his vehicle, picked them up and drove back to the*

*Sunset Motel with them.* After all, it was Mr. Kelly that had the money when they came walking with the change. That was Mr. Kelly.[6]

The jury acquitted the petitioner of the kidnapping charges but convicted him on the felony murder and aggravated robbery counts. In 1986, the Sedgwick County Court granted the petitioner's motion to modify the journal entry of his conviction to show he was convicted as an aider and abettor in the aggravated robbery. The court found "the evidence at trial indicated that the actual robberies were performed by the co-defendants, Regina Baldwin and Yvonne Pink, while [the petitioner] stood watch outside and drove the getaway car to help the escape."[7]

## II.

▮ The petitioner asserts the State did not present sufficient evidence to support his conviction for aiding and abetting Pink and Baldwin in the aggravated robbery and for felony murder. A sufficiency of the evidence claim essentially presents a question of law which we address de novo. *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991); *Beachum v. Tansy*, 903 F.2d 1321, 1325 (10th Cir.), *cert. denied*, 498 U.S. 904, 111 S.Ct. 269, 112 L.Ed.2d 225 (1990). We review a sufficiency claim in a habeas corpus proceeding "to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

5. Mr. Hicks stated he was not sure about the date but believed "it was sometime in *July*." (emphasis added). The dissent takes the position that there was sufficient evidence to show Mr. Kelly borrowed the car on the night of the crime. What is overlooked is the state's evidence on the point is entirely in conflict. When Ms. Walker's vague testimony is considered together with Mr. Hick's version, the jury could have believed Mr. Kelly borrowed a car, but it is nothing short of conjecture to suggest when that event occurred. This gap in proof is fatal to the state's case.

6. Earlier in the closing argument, the prosecutor attempted to square all of the facts concerning the petitioner. He described Mr. Bell spotting the petitioner outside the restaurant and added:

Kelly realized that Bell was looking right at him so he left. I can't do this. So he did. They went to the Sunset Motel, the three of them, borrowed Hicks' car and they went back, returned the car. Had some money, some change, a lot of change and was in a newspaper which is kind of an odd thing to carry money in, but that's all you got in the car.

7. The court denied the petitioner's motion to modify the journal entry to identify him as an aider and abettor in the felony murder conviction, however. Although he was an unarmed accomplice in the armed robbery, the court, following *State v. Thomas*, 239 Kan. 457, 720 P.2d 1059, 1063 (1986), found the petitioner acted as a principal in the felony murder.

reasonable doubt.'" *Cordoba v. Hanrahan,* 910 F.2d 691, 694 (10th Cir.) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* 498 U.S. 1014, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990). In assessing·this claim, we may not weigh conflicting evidence or consider the credibility of witnesses. *Grubbs v. Hannigan,* 982 F.2d 1483, 1487 (10th Cir. 1993) (quoting *United States v. Davis,* 965 F.2d 804, 811 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993)). Instead, we must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Id.* (citations omitted). However, "[t]o be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum,* 903 F.2d at 1332 (citing *United States v. Troutman,* 814 F.2d 1428, 1455 (10th Cir.1987)).

■ We conduct our review of the sufficiency of the evidence "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson,* 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16. Here, the petitioner was convicted under Kan.Stat.Ann. § 21–3205(1) (1988), the aiding and abetting provision of the Kansas criminal code, which provides: "Liability for crimes of another. (1) A person is criminally responsible for a crime committed by another if he intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." Under the Kansas Supreme Court's interpretation of this provision,

> *Mere association* with the principals who actually commit the crime or *mere presence* in the vicinity of the crime are themselves insufficient to ·establish guilt as an aider and abettor; however, when a person knowingly associates himself with the unlawful venture and *participates in a way which indicates he willfully is furthering the success of the venture,* such evidence of guilt is sufficient to go to the jury.

*State v. Wilson,* 221 Kan. 359, 559 P.2d 374, 380 (1977) (citations omitted) (emphasis added); *State v. Burton,* 235 Kan. 472, 681 P.2d 646, 651 (1984). Thus, to establish guilt for aiding and abetting, the prosecution must prove beyond a reasonable doubt, first, that the defendant knowingly associated with the unlawful venture and, second, that he participated in a way which indicates willful furtherance of the success of the venture. *Burton,* 681 P.2d at 652; *State v. Huff,* 235 Kan. 637, 681 P.2d 656, 659 (1984).

Ms. Walker's testimony that the petitioner, Pink, and Baldwin arrived at her motel room together, carrying what may have been the spoils of the robbery, supports an inference the petitioner knowingly associated with the unlawful venture by sharing in its proceeds. To prove the second element of aiding and abetting, the State rested its case on the theory the petitioner participated in the robbery as the getaway car driver. Specifically, the State relied on two pieces of evidence to connect the petitioner to the crime: Ms. Walker's testimony the petitioner, Pink, and Baldwin borrowed Mr. Hicks' car and then returned to the motel room;[8] and Mr. Bell's identification of the petitioner outside the restaurant before the robbery. This evidence, however, when considered with the glaring omissions in the record, does not give rise to a reasonable inference the petitioner acted as a getaway car driver or willfully intended to further the success of the unlawful venture.

Other than the prosecutor's speculative and unsupported arguments to the jury, the record is completely devoid of any fact linking a car to the crime. Mr. Bell testified he did not see a car outside the restaurant when he noticed the petitioner standing in the parking lot. Furthermore, Mr. Bell stated he heard the two robbers running toward the street after exiting the restaurant. He said nothing about hearing a car. Thus, reaching the conclusion the petitioner acted as a getaway car driver requires piling speculation on

---

8. Although the dissent refers to these facts as supportive of Mr. Kelly's conviction, they merely prove the three people were together after the crime was committed. They do not show Mr. Kelly acted willfully in furthering the criminal venture of Pink and Baldwin as required by

*Wilson* and *Burton.* By the state's own admission, that element.of the offense could only have been established from the defendants' use of a car procured by Mr. Kelly. Because there is no such evidence, Mr. Kelly's conviction cannot stand.

inferences from Ms. Walker's testimony. To accept the State's theory, we first must infer Ms. Walker's testimony relates to the night of the robbery.[9] Then, from the fact the petitioner borrowed the car, we must speculate that he used the car to drive Pink and Baldwin to the restaurant and waited nearby to assist in their escape. We must then presume the three left the scene in a car rather than on foot. Finally, from these inferences, we must deduce the petitioner willfully intended to further the success of the unlawful venture.

■ Kansas law, however, does not allow a jury to find an element of a crime from inferences based only on inferences. *See Burton*, 681 P.2d at 651 ("It is a basic principle of the law that presumptions and inferences may be drawn only from facts established and presumption may not rest upon presumption or inference on inference.") (citations omitted). Without impermissibly stacking inferences, the fact the petitioner borrowed a car, perhaps on the night of the robbery, and later appeared with Pink and Baldwin does not constitute proof of the petitioner's participation in the crime.

The essential point, and that which has been overlooked by the dissent, is the car is a red herring. None of the state's witnesses testified that a car was used in the crime. None saw or heard a vehicle at the scene; none testified that a vehicle was used to get to or from the scene. Indeed, the only possible witness to the escape of the two perpetrators was Mr. Bell who simply testified that he heard footsteps leaving the restaurant.

From the prosecutor's closing statement, it can be seen he merely assumed a car was used by Pink and Baldwin in the commission of the offense. He failed to prove that fact.

Because the state's theory of Mr. Kelly's guilt was dependent upon his procurement of a car for use in the crime, the utter failure of proof makes clear the jury could have linked him to the crime only by the use of conjecture.

The only remaining evidence indicating the petitioner's participation in the robbery is Mr. Bell's testimony the petitioner was looking into the restaurant a short time before the robbers arrived. The State argues this evidence shows the petitioner was "casing" the restaurant for Pink and Baldwin. Once again, however, the State bases its conclusion on impermissible inferences; nothing in the record even suggests the petitioner conveyed information to Pink and Baldwin or that they were in the vicinity at the time. Mr. Bell's testimony may raise a suspicion of guilt but is not sufficient to allow a rational jury to conclude beyond a reasonable doubt the petitioner willfully intended to further the success of the unlawful venture.

■ After reviewing the record in the light most favorable to the prosecution, we conclude the evidence was insufficient to support a finding of the essential elements of the crime of aiding and abetting the aggravated robbery beyond a reasonable doubt. Because the petitioner's felony murder conviction rests on his convictions as an aider and abettor in the aggravated robbery, that conviction also falls.[10] Accordingly, we **RE-VERSE** the judgment of the district court and **REMAND** with directions to grant the writ of habeas corpus forthwith. The mandate shall issue immediately.[11]

McWILLIAMS, Senior Circuit Judge, dissents.

I dissent. In my view, the majority's recital of the testimony of witnesses Bell and

---

9. This inference does not flow automatically from Ms. Walker's testimony. Since she stated the petitioner borrowed the car before 10:00 p.m., returned with Baldwin and Pink before midnight, and then watched a news report concerning the robbery, it is equally reasonable to infer the crime was committed a day before the day she describes. In its brief on appeal, the State tries to avoid the time problems in Ms. Walker's testimony by relying on Mr. Hicks' testimony that the petitioner borrowed the car shortly before midnight. Nonetheless, it must be remembered Mr. Hicks said this event took place in *July*. The State's reliance on Mr. Hicks, who also testified he did not see the petitioner with

Pink or Baldwin on the day he borrowed the car, demonstrates the paucity of evidence on which the State has built its aiding and abetting case.

10. Our holding is based solely on a review of the evidence supporting the petitioner's convictions and should not be interpreted to impeach the convictions of the petitioner's codefendants.

11. Notwithstanding the position of the dissent, we think the immediate issuance of the mandate is not only proper, but also required. Mr. Kelly has been in custody nearly ten years for a crime the State failed to prove. Despite an appeal to

810

Walker is amply sufficient to support the determination that Kelly was an aider and abettor.

I would emphasize that there is evidence that, although Kelly may have borrowed Hick's car on more than one occasion, Kelly *did* borrow Hick's vehicle on the night of the robbery-murder. In this regard, Walker testified that on one particular occasion Kelly, accompanied by Pink and Baldwin, borrowed Hick's car. This occurred in a room at the Sunset Motel in Wichita, Kansas, where Walker was living with Hicks and her son. After borrowing Hicks' car, Kelly, Pink and Baldwin took off. According to Walker, the three returned to the Sunset Motel an hour or so later on the same night and had in their possession what the majority states "may have been the spoils of the robbery," which consisted of coins, currency, keys and jewelry, the jewelry having been taken from the purse of one of the victims, along with a weapon of the same caliber as was used in the robbery-murder. Walker further testified that after Kelly and Hicks left the motel to buy drugs, Pink volunteered that she told an employee not to move, and when the employee moved, she shot her, to which comment Baldwin merely shrugged her shoulders. And, then when Kelly and Hicks returned, Walker testified that they, along with Baldwin and Pink, watched a TV newscast which carried a news story of the robbery-murder. This testimony could very easily, I suggest, convince a rational trier of the facts that even if Kelly had borrowed Hick's car on other occasions, Kelly *did* borrow the vehicle on the night of the robbery-murder.

Certainly, Walker's testimony, if believed, showed that Kelly, with Pink and Baldwin at his elbow, borrowed Hick's car on the night of the robbery-murder. Walker's credibility was of course a matter for the jury, not for the Kansas Supreme Court on direct appeal, and certainly not for us on appeal from the district court's denial of Kelly's 28 U.S.C. § 2254 habeas corpus petition. Walker's tes-

the Kansas Supreme Court, which evidently was not called upon to consider the evidence of Mr. Kelly's guilt in circumstances presented to us,

timony, incidentally, was not disputed at trial by Kelly, Pink or Baldwin, none of whom testified.

I also dissent from that part of the majority opinion which directs that the mandate issue forthwith. The robbery-murder, which formed the basis for the present prosecution, occurred on May 3, 1983. Trial occurred in September 1983. In March 1985, the Kansas Supreme Court on direct appeal affirmed the convictions. *State v. Pink,* 236 Kan. 715, 696 P.2d 358 (1985). In so doing, the Kansas Supreme Court considered and rejected the three defendants' argument that, *inter alia,* there was insufficient evidence to support the jury's guilty verdicts. A motion for state post-conviction relief filed pursuant to Kansas statute was denied by the trial court on November 29, 1988. The Kansas Court of Appeals affirmed on September 22, 1989, and the Kansas Supreme Court denied a petition for review on November 9, 1989. Nearly two years thereafter Kelly filed the present proceeding in the United States District Court for the District of Kansas on May 13, 1991. Over a year later, that court denied his petition on September 2, 1992. In view of this protracted chronology extending over ten years, I see no reason to have the mandate issue forthwith. Kelly may well be on the street before the State of Kansas has time to file a petition for rehearing.

prolonging his incarceration to allow the State time to file a petition for rehearing is unjust.