**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 10 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MARIA LOURDES ARAGON,

      Defendant-Appellant.

No. 96-1309
(District of Colorado)
(D.C. No. 95-CR-19-S)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **LUCERO,** and **MURPHY**, Circuit Judges.

---

      Following a jury trial, Defendant Maria Lourdes Aragon was found guilty of conspiracy to possess with intent to distribute and to aid and abet the manufacture of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and § 846, and of conspiracy to possess ephedrine, knowing or having reasonable cause to believe that the ephedrine would be used in the manufacture of

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

methamphetamine, in violation of 21 U.S.C. § 841(d)(1)-(2) and § 846. The jury also found Aragon's interest in certain real property subject to forfeiture, pursuant to 21 U.S.C. § 853. In addition, Aragon was found guilty of using and carrying a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c), but that count was dismissed following the Supreme Court's decision in *Bailey v. United States*, 116 S. Ct. 501 (1995). Finally, Aragon was acquitted of two other charges, possession of ephedrine, knowing or having reasonable cause to believe that the ephedrine would be used in the manufacture of methamphetamine, in violation of 21 U.S.C. § 841(d)(1)-(2), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). She was sentenced to imprisonment for a term of 240 months on the first conspiracy conviction and to imprisonment for a term of 120 months on the second conspiracy conviction, to be served concurrently.

On appeal, Aragon argues that (1) there was insufficient evidence to convict her of the conspiracy offenses; (2) the trial court erred by denying her motion *in limine* requesting that all evidence pertaining to her use of an alias be excluded; (3) the trial court erred by refusing her request for the appointment of a psychologist to determine whether she suffered from an impairment which would warrant a downward departure under the Sentencing Guidelines; (4) the trial court erred in attributing certain drug amounts to her for purposes of determining her

base offense level under the Sentencing Guidelines; and (5) the trial court erred by assigning her a "minor," rather than a "minimal," role in the conspiracy for purposes of sentencing. This court affirms.

## I. BACKGROUND

While on patrol in December 1994, a detective from the Sheriff's Department in Fremont County, Colorado, came upon a large U-haul truck stuck in a ditch. The truck contained approximately twenty-one barrels of ephedrine, which is a precursor chemical used to manufacture methamphetamine. The driver of the truck, Ricardo Perez, was arrested. He ultimately cooperated with law enforcement officers and testified on behalf of the government at the trial of Aragon and her codefendants, Erenio Perez and Erasmo Perez.[1]

Ricardo testified that he was involved in an extensive methamphetamine business in Colorado with Erenio Perez, his brother. Ricardo knew Aragon as Erenio's girlfriend[2] and stated that she lived with Erenio in Colorado Springs. In September 1994, Aragon, Ricardo's wife, and another individual purchased

---

[1]Aragon was charged in the indictment with Erenio Perez, Erasmo Perez, and Sylvia Perez. Like Aragon, Erenio was found guilty of the two conspiracy counts. He was also found guilty of the two possession counts and four firearm counts, but was acquitted of one firearm count. Erasmo Perez was acquitted of all charges. The charges against Sylvia Perez were dismissed pursuant to a plea agreement in another case in which she was also indicted.

[2]Aragon is alternately described by those who testified as Erenio's girlfriend and wife.

property near Westcliffe, Colorado (the "Westcliffe property"), paying $9000 cash as a down payment. According to Ricardo, the property was purchased for purposes of storing methamphetamine acquired in California to sell in Colorado and barrels of ephedrine acquired in Colorado to sell in California. Ricardo further testified that several people, including Aragon, went to California in October 1994 to get fake driver's licenses. Aragon obtained a license in the name of Maria Ceja Avila.

Several officers testified about their surveillance of the defendants in late 1994 and the searches of defendants' various properties conducted after Ricardo was arrested. During the search of a motel room which was previously under surveillance, officers found an itemized billing statement from the motel in the name of Maria Avila. During the search of the Westcliffe property, officers found methamphetamine, other illicit drugs, ammunition, firearms, a bulletproof vest, and a vehicle with two hidden compartments. In an RV on the Westcliffe property, officers found $84,000 in cash, firearms, and a triple beam scale. While searching another piece of property in Colorado owned by Erenio and Ricardo, officers found numerous barrels of ephedrine, a firearm, and ammunition. In the home shared by Aragon and Erenio, officers found an empty barrel with the name and address of the Chemins Company, $6580 in cash, torn records regarding the purchase of the Westcliffe property, and various documents in the name of Maria

-4-

Aragon, Lourdes Aragon, and Maria Avila. Finally, during the search of a vehicle purchased by Aragon using her alias, officers found throwing stars, a night vision scope, a firearm, and $7000 in cash.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Aragon first claims the evidence was insufficient to sustain her conspiracy convictions. Whether the government introduced sufficient evidence to sustain her convictions is a question of law which this court reviews de novo. *See United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997). In examining the record, "we view the evidence in the light most favorable to the government without 'weigh[ing] conflicting evidence or consider[ing] the credibility of witnesses.'" *United States v. Ramirez*, 63 F.3d 937, 945 (10th Cir. 1995) (alterations in original) (quoting *Kelly v. Roberts*, 998 F.2d 802, 808 (10th Cir. 1993)). This court will not reverse a jury's guilty verdict "'unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Romero v. Tansy*, 46 F.3d 1024, 1032 (10th Cir. 1995)). So long as the jury's verdict is "'within the bounds of reason,'" it will not be disturbed on appeal. *Id.* (quoting *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993)).

To convict a defendant of conspiracy in violation of 21 U.S.C. § 846, the government must establish the following elements beyond a reasonable doubt:

"(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *Carter*, 130 F.3d at 1439. Aragon contends the government did not meet its burden of introducing sufficient evidence to establish any of the four elements. Although she concedes the record is "replete with references" to her being present on occasions when drugs were transported, she argues that "there is no evidence supporting the required nexus between [her] presence and her knowledge or activity in furtherance of the crimes charged."

**1. Agreement**

An agreement constituting a conspiracy may be inferred "'from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose.'" *Id.* (quoting *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994)). Although "mere association" with conspirators is insufficient to support a conspiracy conviction, "frequent contacts" among conspirators and "their joint appearances at transactions and negotiations" tend to show the existence of an agreement. *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (internal quotations omitted).

The government introduced evidence that Aragon, along with two others, purchased the Westcliffe property where illegal drugs were stored. The real

estate broker who sold the Westcliffe property testified that he received $3000 cash from each of the three purchasers as earnest money.[3] Ricardo Perez, who testified for the government, stated that the "intended use" of the property was "[t]o bury drugs."

Aragon argues there was no evidence that she knew the Westcliffe property was being used for the storage of drugs. Ricardo testified, however, that Aragon was present on certain occasions when drugs were buried on the Westcliffe property, though he further stated that only he and Erenio Perez knew exactly where the drugs were buried. From this evidence, the jury could have reasonably inferred that, although Aragon may not have known exactly where drugs were kept on the property, she nonetheless knew that drugs were being stored there.[4]

The government also introduced evidence that Aragon, using an alias,[5]

---

[3]During direct examination, Ricardo Perez testified that the property was purchased with drug proceeds. On cross examination, however, he stated that he was not sure where Aragon got her portion of the payment.

[4]Other evidence also supported the government's assertion that Aragon knew the members of the conspiracy were dealing drugs. For example, Vladamar Lansky testified that Aragon was present when he delivered ephedrine to Ricardo Perez at an RV park and when he purchased methamphetamine from Robert Lopez at a ranch south of Colorado Springs. Mr. Lansky further testified that Aragon was present when he and others removed methamphetamine from a hidden compartment in an RV, which was parked at a private residence.

[5]Aragon separately argues the district court erred in admitting evidence regarding her use of an alias. This court concludes the district court did not err in admitting such evidence. *See infra* Part II.B. We therefore consider Aragon's use of an alias in determining whether the government presented sufficient evidence

purchased a vehicle that was used by other members of the conspiracy. During a search of the vehicle, officers found a semiautomatic handgun, $7000 cash, four throwing stars, and a night vision scope. Additionally, the evidence showed that Aragon used an alias to rent a motel room during the time frame of the conspiracy, and various vehicles linked to other members of the conspiracy were seen at the motel during the period of the rental. *Cf. United States v. Burgos*, 94 F.3d 849, 872 (4th Cir. 1996) ("Employing an alias and attempting to conceal identity reinforces the conclusion of the existence of a conspiracy."), *cert. denied*, 117 S. Ct. 1087 (1997).

Finally, as Aragon concedes, the evidence established that she was present on many occasions when drug transactions were conducted. "Mere presence" at the scene of a crime does not, by itself, prove that a person is a member of the conspiracy, but such presence is a "material factor." *United States v. Esparsen*, 930 F.2d 1461, 1472 (10th Cir. 1991). The evidence, considered as a whole and in a light most favorable to the government, is sufficient to establish that Aragon entered into an agreement with her coconspirators to violate the law.

### 2.    Knowledge of Objectives

To establish that a defendant had knowledge of the essential objectives of the conspiracy, the government must "show that the 'defendant shared a common

---

to sustain her conspiracy convictions.

purpose or design with his alleged coconspirators.'" *Evans*, 970 F.2d at 669 (quoting *United States v. Horn*, 946 F.2d 738, 740 (10th Cir. 1991)). In this case, the apparent objective of the conspiracy was to sell drugs in Colorado which had been purchased in California and to sell barrels of ephedrine in California which had been purchased in Colorado. Aragon was a one-third owner of one of the properties in Colorado used to store the drugs and barrels of ephedrine. The evidence established that she was present during several drug transactions. The jury could therefore have reasonably inferred that Aragon had knowledge of the conspiracy's objectives.

3.    **Knowing and Voluntary Involvement**

"A jury may presume a defendant is a knowing participant in the conspiracy when he or she acts in furtherance of the objective of the conspiracy." *Carter*, 130 F.3d at 1440. As discussed, an essential component of the conspiracy was the storage of illegal drugs on properties the defendants owned in Colorado. Aragon, along with two others, purchased one of the properties where drugs were stored. Her purchase of the property thus constituted an act in furtherance of the objective of the conspiracy. The jury could therefore have reasonably concluded that Aragon was a knowing and voluntary participant in the conspiracy.

### 4. Interdependence

Interdependence among coconspirators exists when "each coconspirator's activities constitute essential and integral steps toward the realization of a common, illicit goal." *Id.* Although each coconspirator must generally be aware of the existence of the other coconspirators, each coconspirator "is not required to be personally acquainted with all coconspirators or know all of the details of the venture." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991).

The coconspirators shared a common goal, the purchase and sale of ephedrine and methamphetamine. Aragon's purchase of the Westcliffe property, on which drugs were stored, constituted an "essential" step toward realization of that goal. The evidence established that other members of the conspiracy also took affirmative steps to facilitate the goals of the conspiracy. The evidence presented was thus sufficient to establish interdependence among the coconspirators.

### 5. Summary

Although the evidence supporting Aragon's conspiracy convictions must be "substantial" and "do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (internal quotations and citations omitted). After carefully reviewing

-10-

the record, this court concludes the government presented sufficient evidence upon which to convict Aragon of the conspiracy charges.[6]

## B.  Use of Alias

Aragon next contends the trial court erred by denying her motion *in limine* requesting that all evidence regarding her use of an alias be excluded.  In her motion, Aragon sought to exclude thirteen evidentiary items containing her alias, including a driver's license, motel billing records, vehicle records, money grams, and various receipts.  The district court denied her motion, and the items were admitted at trial, over Aragon's objections.

On appeal, Aragon asserts the items were "never connected with any of the other alleged [illegal] acts," were "not inextricably intertwined as part of the charged criminal episode," and were not "necessary to complete the story of the crime charged."  Aragon therefore argues the district court abused its discretion in admitting the items because they were irrelevant and highly prejudicial.  The government first argues that because Aragon objected to the introduction of the items at trial solely on the basis of relevance, she has waived her objection based

---

[6]To the extent that Aragon argues the evidence was insufficient to sustain her conspiracy convictions because the government failed to prove she actually or constructively possessed contraband, her argument is rejected.  A conspiracy conviction for possession with intent to distribute or manufacture does not require evidence of possession.  *See United States v. Slater*, 971 F.2d 626, 631 (10th Cir. 1992); *United States v. Esparsen*, 930 F.2d 1461, 1472 (10th Cir. 1991).

on Federal Rule of Evidence 403. Alternatively, the government argues the items were admissible, as they "were all relevant to proving [Aragon's] knowledge and role in the conspiracy."

This court need not decide whether Aragon waived her objection based on Rule 403 because we conclude the district court did not abuse its discretion in admitting the evidence. "A district court has broad discretion in balancing the probative value of evidence against its potential prejudicial effect, and will be reversed only on a showing of abuse of that discretion." *United States v. Scarborough*, 128 F.3d 1373, 1378 (10th Cir. 1997).

Contrary to Aragon's assertion, the government did tie her use of the alias to the conspiracy. For example, all uses of the alias occurred during the time frame of the conspiracy and, more specifically, during the four months prior to the date she was arrested. Aragon used the alias to purchase a vehicle that was used by other members of the conspiracy. During a search of the vehicle, officers found a semiautomatic handgun, $7000 cash, four throwing stars, and a night vision scope. *Cf. United States v. Copeland*, 51 F.3d 611, 617 (6th Cir. 1995) (holding district court did not abuse its discretion in admitting receipts with defendant's alias and noting receipts tied defendant "to certain automobiles referred to in testimony related to the drug conspiracy period"). Aragon also used the alias to rent a motel room; during surveillance of the motel, officers observed

numerous vehicles linked to the conspiracy. This court therefore agrees with the government that Aragon's use of the alias was relevant to show, among other things, her knowledge of and role in the conspiracy. *Cf. United States v. Glass*, 128 F.3d 1398, 1408 (10th Cir. 1997) ("A defendant's use of an alias to conceal his identity from law enforcement officers is relevant as proof of consciousness of guilt."); *United States v. Walcott*, 61 F.3d 635, 638 (8th Cir. 1995) ("[The defendant's] use of aliases and other conduct enlisted to hide his identity and whereabouts were consistent with involvement in the drug trade.").

Although relevant, Aragon's use of an alias would be inadmissible under Rule 403 if its probative value was substantially outweighed by a danger of unfair prejudice. Aragon has failed to explain, however, how the admission of the items containing her alias unfairly prejudiced her. Aragon apparently argues that the items were prejudicial because they were not connected in any way to the conspiracy, an argument which we have already rejected. Under the circumstances, this court finds no abuse of discretion in admitting the evidence. *Cf. Scarborough*, 128 F.3d at 1380 (finding no abuse of discretion in admitting driver's licenses with defendant's alias because "licenses were relevant to link[] defendant to the crime").

## C. Appointment of Psychologist

Aragon next argues the district court erred by refusing her request for expert services under the Criminal Justice Act (CJA). The CJA provides that district courts shall authorize counsel of indigent defendants to retain experts upon finding that the expert services are "necessary for adequate representation" and that the defendant is financially unable to obtain the services. 18 U.S.C. § 3006A(e)(1). In an ex parte motion filed with the district court prior to sentencing, Aragon's counsel requested that the court authorize the hiring of a psychologist, stating that "[i]f a psychologist could examine certain issues and facts" concerning her background, "there may be some factual grounds under the [Sentencing Guidelines] for a departure of a kind not taken into consideration by the Guideline Commission." In support of the request, counsel stated that "there may be an issue of the defendant's age in relation to Mr. Erenio Perez, her husband and co-defendant. . . . This issue arises because of the death at a very young age of [her] natural father." The district court denied the motion, stating that "[a]ll of the reasons set forth by [Aragon] for seeking the services of a psychologist have already been expressly considered by the Guidelines."

At sentencing, the district court held a closed hearing to again consider Aragon's request for the appointment of a psychologist. Aragon's counsel stated that if a psychologist examined Aragon, the psychologist may find that Aragon's

dependence on Erenio was so extraordinary that it should be taken into account under the Sentencing Guidelines in allowing a downward departure. Counsel admitted that he did not know whether such dependence existed, but argued that without a psychological evaluation, he could not know. The district court again denied Aragon's request.

On appeal, Aragon argues the district court abused its discretion in refusing to appoint a psychologist. To obtain expert services under the CJA, a "defendant must do more than allege that the services would be helpful." *United States v. Kennedy*, 64 F.3d 1465, 1470 (10th Cir. 1995). The burden is on the defendant to show with particularity that the requested services are "necessary" to present an adequate defense. *See Castro v. Ward*, No. 97-6179, 1998 WL 113193, at *16 (10th Cir. Mar. 2, 1998). "'[U]ndeveloped assertions that the requested assistance would be beneficial'" to the defense are not sufficient to satisfy this burden. *Matthews v. Price*, 83 F.3d 328, 335 (10th Cir. 1996) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985)); *see also Liles v. Saffle*, 945 F.2d 333, 336 (10th Cir. 1991) ("General allegations supporting a request for court appointment of a psychiatric expert, without substantive supporting facts, . . . will not suffice to require the appointment of a psychiatrist to aid in the preparation of a criminal defense."). This court reviews the denial of a request for expert services under the CJA for abuse of discretion. *See Kennedy*, 64 F.3d at 1465.

-15-

In her brief, Aragon states that she requested a psychologist "to see if there were any problems that could have led to her being involved with Mr. Erenio Perez." She further states that "[i]t is not outside the realm of possibility that [she] could have been suffering from some . . . unhealthy dependence upon Mr. Erenio Perez." These general assertions, particularly in light of Aragon's two previous convictions for possession of methamphetamine, fail to demonstrate the necessity of a psychologist's services to the presentation of her defense. *See, e.g.*, *id.* at 1470. We therefore find no abuse of discretion in the district court's denial of her request.

## D.  Drug Quantities

Aragon next argues the district court erred in considering certain drug quantities as relevant conduct for purposes of determining her base offense level because the quantities were not foreseeable to her. At sentencing, the district court determined that Aragon's base offense level was 38, based on its finding that 63.41 kilograms of methamphetamine were attributable to her.[7]

---

[7]Because the 63.41 kilograms of methamphetamine was sufficient to support the highest base offense level under the Sentencing Guidelines, the court did not specifically consider whether the ephedrine involved in the conspiracy should also be attributed to Aragon. In its sentencing statement, the government argued that Aragon should be held accountable for 1375 kilograms of ephedrine, based on her conviction for conspiracy to possess ephedrine, knowing and having reasonable cause to believe that ephedrine would be used in the manufacture of methamphetamine. For purposes of computing Aragon's base offense level, the government argued the ephedrine should be converted to methamphetamine at a

This court reviews "the district court's factual findings regarding the quantity of drugs for which a defendant is held responsible for clear error." *United States v. Hooks*, 65 F.3d 850, 854 (10th Cir. 1995). The drug quantities attributable to a defendant convicted of conspiracy are established not by looking at the quantity of drugs involved in the conspiracy as a whole, but rather by looking at the quantity of drugs the defendant reasonably foresaw or which fell within the scope of the defendant's agreement with coconspirators. *See id.*; *United States v. Roberts*, 14 F.3d 502, 522 (10th Cir. 1993). The government bears the burden of proving, by a preponderance of the evidence, the quantity of drugs attributable to each defendant in the conspiracy. *See Hooks*, 65 F.3d at 854. The district court may estimate the quantity provided the information underlying the estimate possesses a "minimum indicia of reliability." *United States v. Browning*, 61 F.3d 752, 754 (10th Cir. 1995). The court may also consider drug quantities associated with a drug charge for which the defendant was acquitted so long as the government proves by a preponderance of the evidence that the quantities were foreseeable by the defendant. *See United States v. Garcia*, 987 F.2d 1459, 1460-61 (10th Cir. 1993).

---

ratio of ten to eight, resulting in an additional 1100 kilograms of methamphetamine attributable to Aragon.

To support the base offense level of 38, the government was required to prove by a preponderance of the evidence that at least thirty kilograms of methamphetamine[8] were foreseeable by, and thus attributable to, Aragon. *See* U.S.S.G. § 2D1.1(c) (amended Nov. 1, 1997). Among other drug quantities, 120 pounds (approximately fifty-four kilograms) of methamphetamine were attributed to Aragon based on Ricardo Perez's testimony that the Dodge Dart found on the Westcliffe property was used to transport ephedrine to California and bring back methamphetamine. According to Ricardo, the vehicle was used on four occasions to bring back on each occasion approximately thirty pounds of methamphetamine, which was then buried on the Westcliffe property until it was sold. These activities were within the scope of the conspiracy, the purpose of which was to sell drugs in Colorado that had been purchased in California and to sell barrels of ephedrine in California that had been purchased in Colorado. Aragon was a one-third owner of the Westcliffe property, which was purchased specifically for storing drugs. According to Ricardo, Aragon was present on the property when drugs were buried, although she did not know exactly where the drugs were buried.

---

[8]Effective November 1, 1997, § 2D1.1(c) of the Sentencing Guidelines was amended so that only 15 kilograms of methamphetamine is now required to support a base offense level of 38. *See* U.S.S.G. § 2D1.1(c).

The district court's conclusion that the 120 pounds of methamphetamine was reasonably foreseeable to Aragon is supported by the record and is not clearly erroneous. Because this quantity is sufficient to support Aragon's base offense level of 38, we need not consider whether the court erred in attributing additional amounts of methamphetamine to Aragon.

### E. Role in the Offense

Aragon's final argument is that the district court erred by refusing to grant her a four-level reduction in her offense level based on her alleged "minimal" role in the conspiracy. This court reviews the district court's factual findings regarding a defendant's role in the offense for clear error. *See United States v. Ayers*, 84 F.3d 382, 383 (10th Cir. 1996). Questions of law concerning application of the Sentencing Guidelines are reviewed de novo. *See United States v. Lacey*, 86 F.3d 956, 967 (10th Cir.), *cert. denied*, 117 S. Ct. 331 (1996). The burden is on the defendant to establish by a preponderance of the evidence that she is entitled to an offense level reduction under the Sentencing Guidelines. *See Ayers*, 84 F.3d at 383.

Section 3B1.2 of the Sentencing Guidelines "'vests the district court with discretion to grant a base offense level reduction if it finds a defendant is less culpable relative to other participants in a given offense.'" *Id.* (quoting *United States v. Santistevan*, 39 F.3d 250, 254 (10th Cir. 1994)). The court may reduce

the defendant's offense level by four levels if it finds the defendant was a "minimal" participant in the criminal activity, by two levels if the defendant was a "minor" participant in the activity, or by three levels if the defendant's actions fell between a minimal and minor role. U.S.S.G. § 3B1.2.

In this case, the district court granted Aragon a two-level reduction, finding that she was a minor, rather than a minimal, participant in the conspiracy. The application notes to § 3B1.2 provide that the four-level reduction for a minimal role "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. . . . [T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. § 3B1.2 application note 1. The notes further provide that the four-level adjustment is to be used "infrequently" and "would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment." *Id.* application note 2. A minor participant, on the other hand, is defined as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* application note 3.

As discussed above, Aragon purchased property on which drugs were stored and, using an alias, purchased a vehicle which was used by other members of the

-20-

conspiracy. Her purchases facilitated the overall goals of the conspiracy. The district court's conclusion that Aragon was a minor, rather than minimal, participant in the conspiracy is supported by the record and is not clearly erroneous.

The judgment of the United States District Court for the District of Colorado is **AFFIRMED**.

ENTERED FOR THE COURT:


Michael R. Murphy
Circuit Judge